Filed 8/3/23  P. v. Moustafa CA6
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AHMAD MOUSTAFA,<br><br>    Defendant and Appellant. | H047359<br>(Santa Clara County<br> Super. Ct. No. B1368888) |

Following a court trial, appellant Ahmad Moustafa was convicted of multiple offenses—including torture, sexual penetration, criminal threats, human trafficking, and spousal battery—against his fiancée and her brother.  On appeal, Moustafa argues that his jury trial waiver was inadequate and that the trial court should have excluded his prior statements to the police as involuntary or obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Moustafa also argues that his trial counsel was ineffective because he failed to investigate and present evidence of Moustafa's mental disorder, failed to investigate and present evidence of Moustafa's character for nonsexual deviancy and nonviolence, and failed to seek sanctions for the police's failure to retain the victims' cell phones.  He further argues that the trial court erred under Evidence Code section 352 by excluding the defense's proposed expert witness on "black magic" ritual Islamic practices and evidence that his fiancée's brother once said that he deserved to be beaten and that the cumulative impact of his claims of ineffective assistance and the

multiple trial errors require reversal of his convictions.  And finally, in a supplemental brief, Moustafa argues that if the judgment is not otherwise reversed, he is entitled to resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.).

We consider unreasonable trial counsel's failure to investigate Moustafa's known history of mental illness, given the nature of the charged offenses, but conclude on this record that Moustafa has not established prejudice.  Except for his claim that he is entitled to resentencing under Senate Bill No. 567, we reject Moustafa's claims of error.  We reverse the judgment for the limited purpose of resentencing.[1]

## I.      BACKGROUND

### A.      *The Information and Jury Trial Waiver*

On February 26, 2015, the Santa Clara County District Attorney filed an information charging Moustafa with torture (Pen. Code, § 206; count 1)[2], two counts of sexual penetration by force, violence, duress, menace, or fear of bodily injury (§ 289, subd. (a)(1)(A); counts 2 and 3), human trafficking (§ 236.1, subd. (a); count 4), two counts of criminal threats (§ 422; counts 5 and 7), and inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a); count 6).  As to counts 2 and 3, it was alleged that Moustafa inflicted aggravated mayhem and torture and personally inflicted great bodily injury within the meaning of the "One Strike" law (§ 667.61, subds. (a) & (d)).  Moustafa was alleged to have committed counts 1 through 5 against victim John Doe

---

[1] We initially filed an opinion in this case on February 28, 2023.  On March 28, 2023, we granted Moustafa's petition for rehearing and requested supplemental briefing from the parties.  After we granted rehearing, Moustafa filed a petition for writ of habeas corpus (case number H050986), which we have ordered considered with this appeal.  By separate order, we have issued an order to show cause returnable in the superior court this same day.

[2] Unspecified statutory references are to the Penal Code.

(S.D.) and counts 6 and 7 against victim Jane Doe (A.D.). On November 2, 2017, Moustafa waived his right to a jury trial and the matter proceeded by way of court trial.

**B.    *The People's Case***

**1.    *S.D.***

S.D. was born in the United States, though his family was originally from Pakistan. S.D. met Moustafa in 2009 when S.D. was still in high school and living with his parents in Santa Maria. At the time, Moustafa was dating S.D.'s older sister, A.D.

Moustafa told S.D. and A.D.'s family that he was from Egypt, but he had previously lived in France. Moustafa claimed he was a "self-made millionaire" and was from a prominent family. He said he was the nephew of former Egyptian President Hosni Mubarak, and he had worked for the Egyptian military and the United States Air Force specializing in interrogating terrorists. He also said he was a United States diplomat and had diplomatic immunity. Moustafa claimed that he frequently had undercover "men" surveilling him that protected him and those he cared about. Moustafa described his "men" as Middle Eastern men who drove SUV's with black-tinted windows.

S.D. believed Moustafa's claims about his family background and employment. Moustafa sometimes showed him items as proof: a flight suit with Moustafa's name on it, a box of M&M's that had a government seal, and videos of the Egyptian military and torture. Sometimes, Moustafa would gesture or nod toward men who wore suits, and S.D. believed that the men made similar hand gestures or nodded back at Moustafa.

S.D. initially felt some hesitation toward Moustafa—at one point, he falsely claimed he was in a gang so he could put Moustafa "on guard." Yet by early 2010, S.D. started to respect Moustafa and saw him as a mentor or older brother. Moustafa gave S.D. advice about his personal life and shared that he was then in the process of divorcing his ex-wife, Lauren.

After S.D. graduated from high school, he received a scholarship to attend college in Irvine. During his freshman year in college, S.D. noticed that Moustafa's "tone"

3

started to change. Moustafa and A.D. frequently broke up and got back together, and Moustafa seemed angrier—sometimes directing his anger toward S.D. Tensions also arose between Moustafa and S.D.'s extended family, and Moustafa once threatened to put a bullet in S.D.'s uncle's head. Moustafa was violent with S.D. once in November 2011, when S.D. accompanied Moustafa to an out-of-state marathon. Moustafa became angry when S.D. failed to meet him at all the marathon checkpoints and, during the drive back, grabbed S.D.'s neck and slapped him.

S.D. dropped out of college after a year. His grades were poor, and Moustafa sometimes lectured S.D. about how he was a disappointment.

In 2012, Moustafa and A.D., who had graduated from college, moved north to an apartment in Mountain View. In August of that year, S.D. moved in with Moustafa and A.D. At the time, Moustafa told S.D. that he was working for the government at the NASA Ames Research Center and was required to take many trips.

S.D. initially shared a bedroom with A.D. The room had two beds on opposite sides of the room. Moustafa slept in a separate room. Over time, S.D. noticed that A.D. spent more time sleeping in Moustafa's room instead of in the shared room with S.D.

Moustafa told S.D. to get a job; otherwise, Moustafa threatened to both kick S.D. out of the apartment and also keep him under surveillance by Moustafa's "men." S.D. managed to find several jobs, but Moustafa verbally increased his financial pressure on S.D. He showed S.D. credit card statements and said that S.D. was a burden. All of S.D.'s paychecks went to Moustafa, and Moustafa started to exercise more control over S.D., including over his food intake. S.D. was required to call Moustafa "sir," and "saeka," which Moustafa said was an Arabic word for thunder or lightning. Moustafa called S.D. "Susu," which Moustafa said meant urine.

One time, Moustafa force-fed S.D. and afterwards told S.D. he was weak and should move home. S.D. returned to Santa Maria and lived with his parents for several weeks. While there, Moustafa called S.D., asked him what he was doing, and told S.D.

4

that his "men" were watching him. Moustafa then told S.D. he was willing to give S.D. a second chance if S.D. wrote him an apology letter. After S.D. wrote the letter, Moustafa told S.D. to return to Mountain View, and S.D. complied.

In January 2013, S.D. came back from work and started to watch a show on his computer in the room he shared with A.D. S.D. saw that A.D. was sleeping, so he started to watch pornography and masturbated. When S.D. stood up to change his shorts, Moustafa opened the door, looked at S.D., and asked him what he was doing. S.D. replied that he was changing. Moustafa told S.D. to go to bed and closed the door.[3]

In February 2013, Moustafa accused S.D. of sexually abusing A.D. He also claimed that S.D. had "spread[] [S.D.'s] genitals all over [the] living room area," which caused Moustafa to develop cancer.[4] Moustafa told A.D. to bring him all of S.D.'s important documents, such as his report cards and identification cards, and shredded them. Later that same month, Moustafa accused S.D. of having raped A.D. the night that he saw S.D. changing shorts. After making the accusation, Moustafa punched S.D. in the chest, abdomen, and ribs. The next day, Moustafa repeated the abuse, which became his "daily exercise." Around that time, Moustafa forced S.D. to move out of the bedroom with A.D. and into the apartment's second bedroom.

In March 2013, Moustafa started using tools such as pliers and ratchets to harm S.D. Moustafa would direct S.D. to remove his clothes or would take them off. He focused his attacks on S.D.'s genitals. Moustafa used pliers to grab S.D.'s penis and used his other hand or another tool to squeeze S.D.'s testicles or the shaft of his penis, including the tip. Moustafa aimed specifically for S.D.'s urethra. Moustafa also used

---

[3] S.D. later testified that he was unable to masturbate after 2013 because he had "no functionality," but he did masturbate "close to every day" in 2012. S.D. denied that he viewed any pornography that involved torture, bondage, or sadomasochism.

[4] Moustafa previously told S.D. and his family that he had prostate cancer.

5

paper matches or lighters to burn parts of S.D.'s body, including his nipples, penis, anus, buttocks, pubic hair, chest hair, fingers, and toes. Afterwards, Moustafa applied bleach to S.D.'s wounds. Moustafa also used a hammer to hit S.D.'s toes and fingers, and he once poured hot wax from candles onto S.D.'s chest.

Moustafa told S.D. that he was trying to burn S.D.'s urethra so he could "seal" it because Moustafa believed that S.D. had raped A.D. Moustafa also told S.D. that he wanted to make sure that S.D. could never have kids or be able to urinate again.

One time, Moustafa had S.D., who was undressed, hunch over an office chair. Moustafa told S.D. that since S.D. "like[d] putting your dick in my girl," he was going to show S.D. "how it feels." Moustafa then grabbed either a Statute of Liberty or Eiffel Tower figurine and inserted it into S.D.'s anus.

Another time, Moustafa became upset with the way S.D. cleaned the kitchen stove, so he turned on one of the stove's coils, pulled S.D. by the hair, and burned his face on the coils. S.D. ended up with burn marks on his nose, forehead, and hair.

By late September 2013, Moustafa had moved S.D. out of the bedroom and into the kitchen and dining area. Around then, S.D. recalled an incident where Moustafa struck him multiple times with a crowbar while holding his penis with pliers. Moustafa also used a shoe to strike S.D.'s penis and testicles. Because of the beatings, S.D. had difficulty walking and had a limp.

S.D. screamed during Moustafa's attacks and sometimes Moustafa would take S.D.'s clothes and stuff them down S.D.'s throat. Moustafa also played loud music to drown out S.D.'s screams. Moustafa would smile, smirk, and sometimes dance while hurting S.D.

S.D. did not always try to resist Moustafa's attacks. He feared Moustafa and believed that he was who he said he was—someone who was experienced with torture. Sometimes A.D. was in the apartment when Moustafa attacked S.D. S.D. also saw Moustafa attack A.D.; Moustafa choked A.D. until she was unconscious, kicked her ribs,

6

kicked her stomach, and slapped her. S.D. recalled that he once saw Moustafa pull A.D. and drag her to a room.

As time progressed, Moustafa's control over S.D. and A.D. persisted. S.D. still worked multiple jobs and was required to give Moustafa all the money he earned. Sometime in early 2013, Moustafa took S.D.'s laptop and directed S.D. to give him the password. He told S.D. and A.D. to disable their social media accounts, and the siblings were not permitted to tell their parents where they lived. Moustafa required S.D. to write a journal documenting what he did each day.

Because he was often locked in his room, S.D. was frequently late and got into trouble at work. Sometimes S.D. would have black eyes or choke marks on his neck. S.D. told coworkers to "stop harassing" him when they asked him about his injuries. He also sometimes lied and said that he fell off his bicycle.

Moustafa told S.D. that if S.D. thought he was a monster, S.D. could leave. Moustafa, however, also told S.D. that he had "men" everywhere and that if S.D. walked more than a block away from the apartment, S.D. would be shot.

By October 2013, S.D. was starting to feel suicidal. One morning, Moustafa gave S.D. an article that explained the consequence of rape in Islamic culture—he would be tortured or stoned to death and spend his afterlife in hell. Later, Moustafa dropped S.D. off at work at a grocery store and told him to enjoy his day. Based on Moustafa's expression and mannerisms, S.D. became convinced that he would die that day.

Concerned for his life, S.D. decided to reach out to a coworker, Javier Zaragoza. S.D. had never told Zaragoza about Moustafa's abuse, and it took "a little bit of convincing" to get Zaragoza to help him. S.D. told Zaragoza that if he did not leave tonight, he would die, and he needed to get to San Luis Obispo. Zaragoza agreed to help S.D., and the two left that evening in Zaragoza's car. During the drive, S.D. told Zaragoza about the abuse that Moustafa inflicted on him and specifically identified Moustafa by name.

7

Zaragoza drove S.D. to a family friend's restaurant in San Luis Obispo. On the way there, S.D. used Zaragoza's phone to call his parents and asked them to meet him at the restaurant. After Zaragoza dropped S.D. off, S.D. told his parents about Moustafa's attacks. He did not try to contact A.D. because he felt betrayed by her.

The following day, the family friend took S.D. to the hospital, where S.D. was treated by a physician friend of S.D.'s family friend. The hospital staff contacted the police.

During trial, S.D. acknowledged that he had made some inaccurate statements in the past. He had once said during a prior interview that he had been suspended from the ceiling by his penis. S.D. acknowledged having elsewhere claimed that Moustafa had threatened him to get him to move to Mountain View and that he had been drugged.

### 2.    *Dr. Rushdi Cader*

Dr. Rushdi Cader, an emergency physician at a hospital in San Luis Obispo, examined S.D. in October 2013. Cader examined S.D. "from head to toe," but some of the hospital records failed to reflect his full examination. For example, S.D.'s perineal or genitourinary exam were not documented.

Cader recalled that he examined S.D.'s genitals, and S.D. had superficial bruising around the scrotal area and denuding of the skin of his penis that appeared inflamed and was likely in a stage of healing. S.D., however, was able to urinate which indicated that his urethra was intact. Cader also observed some mild crusting in the genital area and inflammation, which could be attributable either to a chemical burn from bleach, from matches, or some other inflammatory process that occurred after the injury. Cader opined that the injuries, which he described as "pretty dramatic" and "brutal," could be consistent with the application of tools to S.D.'s penis. S.D. also had bruising to his buttocks and his upper posterior thighs. Cader only performed an external examination of S.D.'s anus and did not perform a rectal exam, which would have required Sexual Assault Response Team (SART) professionals.

8

Cader also examined S.D.'s feet but did not recall seeing bruising to the soles. The photographs showed S.D. had mild bruising on his ankle and a bit of bruising on his toe. S.D. also had a contusion on the upper part of his body and an abrasion on his nose.

### 3. *Dr. Jon Soble*

S.D. was examined by Dr. Jon Soble, a urologist, in November 2013. At the time of the exam, S.D. complained of intermittent penile pain and reported a history of trauma to his penis and urethra. Soble found that S.D.'s penis appeared to be mostly in a state of healing and had a "fairly near completely normal appearance." Soble, however, did note that there was a relatively mild but anormal narrowing of the opening of the urethra through the tip of the penis and some inflammation and "mild blanching" of the glans. Because S.D.'s alleged injuries had occurred approximately six or seven weeks prior to his exam, Soble could neither corroborate nor dispute S.D.'s claims of trauma.

Soble also examined a report prepared by a defense expert, Dr. Michael Ehlert. In his report, Ehlert had opined that the injuries "could be self-inflicted, either for self-pleasure or punishment." Soble, however, thought it was unlikely that S.D. could have sustained the injuries either from a penis ring or from excessive masturbation.

### 4. *Javier Zaragoza*

Javier Zaragoza worked as a grocery store clerk in October 2013. He knew S.D. only as a coworker and not a friend. While working together, Zaragoza noticed some "abnormalities" about S.D. that caught his attention—S.D. sometimes limped, and one time S.D. had significant marks on his face. S.D. explained his injuries by saying that he had fallen off his bicycle. Zaragoza, however, thought it had looked like S.D. had been burned.

One evening, S.D. told Zaragoza that he was in trouble and that his life was in danger. S.D. said that his "brother-in-law" was abusing him and asked Zaragoza for help reaching his parents. Zaragoza agreed to help S.D., and while they were driving, S.D.

recounted how Moustafa had beaten him. Zaragoza drove S.D. to a restaurant in San Luis Obispo and left S.D. with his parents.

### 5. *S.D.'s Coworkers*

By stipulation, the parties agreed that one of S.D.'s coworkers, interviewed by police, said that she had once seen that S.D.'s face was injured when he came to work; he had a black eye and a swollen lip and face. S.D. claimed to have run into a door. S.D. was often late or missed his shift, and he was later terminated. And another time in October 2013, the coworker saw cuts on S.D.'s face.

The parties also stipulated that the assistant store manager where S.D. worked, when interviewed, reported noticing on October 2, 2013, that S.D. had scabs on his forehead and nose. The following day, S.D. called into work and said he was not going to come in because he had been hit by a car when riding his bicycle. On October 4, 2013, S.D. came to work with a limp, and he left work early after complaining of pain in his legs.

### 6. *A.D.*

A.D. met Moustafa in 2009 through a mutual friend and started to date him. On their first date, Moustafa told A.D. that he was an Egyptian diplomat. He also told A.D. that he was the nephew of former President Hosni Mubarak of Egypt, he came from a powerful family, and he had gone to military school. Moustafa showed A.D. balance statements on an American Express account that appeared to show that he had more than a million dollars, and photos of properties abroad which he claimed were owned by his father. However, during their relationship, Moustafa held various jobs including a position as a hotel receptionist, which he explained was a cover to protect his real identity.

Moustafa told A.D. that he had bodyguards who protected him. One time, when A.D. was in college, she told Moustafa that she thought someone had been following her.

10

Moustafa responded that the man following her was his bodyguard and was simply protecting A.D.

In July 2012, A.D. graduated from college and eventually moved to Mountain View to live with Moustafa and work at a local bank. Moustafa later invited S.D. to move in with them.

After living together for a few months, Moustafa started to exert control over A.D. and S.D. He told them where to work, what to eat, and what careers they should be pursuing. At the time, A.D. did not resist Moustafa because she was afraid of him and believed his claims about his identity. Moustafa started to slap A.D. for little things like not making the bed properly. He would pin A.D. against the wall if she tried to talk back to him. He sometimes choked, punched, kicked, and forced A.D. to have sex with him. He threatened to kill her and her family. He took away her car and started driving her to and from her workplace himself. One time, Moustafa shredded S.D.'s identification cards. A.D. had little communication with her parents, and they did not know where she lived.

In January 2013, A.D. was sharing a room with her brother, S.D., when she was awakened by a sound. A.D. saw S.D. standing in front of her, and Moustafa said that S.D. had tried to "do something" to her. To A.D.'s knowledge, S.D. had never touched her inappropriately.

Following the January 2013 incident, A.D. noticed that Moustafa started treating S.D. in a more aggressive and physically abusive manner. Moustafa punched S.D. multiple times in the face and kicked him in the legs and chest. Another time, Moustafa beat S.D. with a tool.

A.D. recalled that one time, Moustafa inflicted something that looked like burns on S.D. in the kitchen. She also recalled an incident where it looked like Moustafa was doing something of a sexual nature to S.D.—she saw S.D. naked and bent over, and Moustafa was hitting him with a glass Eiffel Tower figurine.

11

A.D. described the last three months leading up to October 2013 as "brutal" as Moustafa escalated his physical attacks against S.D. Sometimes Moustafa would put on loud music during the beatings. One evening in October 2013, S.D. failed to return to the Mountain View apartment after work. A.D. and Moustafa became concerned and decided to drive down to Santa Maria to see if they could find S.D. Moustafa was "extremely angry" that evening, and when they arrived at A.D.'s parents' house, Moustafa told A.D. that if he found anyone inside, they were "all going to die."

After finding the house empty, Moustafa drove A.D. back to Mountain View and told her to report S.D. missing. Moustafa coached A.D. to say that S.D. was involved in gangs and used drugs. Both Moustafa and A.D. later went to the police department to give statements. Moustafa told A.D. that he was going to be "fine" and that his "people" would take him back to Egypt, but that if A.D. did not tell the police certain things, he would kill her and her family. Moustafa told A.D. to tell the police that her brother had touched her, that he was in a gang, and that he did drugs. Moustafa expressed concern that the police were going to see injuries on S.D. from the beatings that he had administered and told A.D. to tell the police that he had nothing to do with any beatings. When A.D. went to the police station, she relayed to them the story that Moustafa had coached her to tell.

A.D. later decided to tell the police the truth about Moustafa's abuse. By that time, Moustafa was already in custody.

### 7. *Tina Chang*

In 2013, Tina Chang took a class at a community college with Moustafa, and she and her boyfriend, Luis Mejia, became friends with him. Chang and Mejia also spent time with A.D., but they were unaware that Moustafa and A.D. were in a relationship. Moustafa told Chang that A.D. and S.D. were siblings, and that he had taken S.D. "under his wing." Moustafa also told Chang that he was married to a woman named Lauren, he was an Egyptian diplomat and a covert agent, and that he worked for the government.

12

Moustafa said that his house was wired, and there were always people listening in and conducting surveillance. Chang believed Moustafa and did not confront him about his statements. Moustafa once showed her a picture of himself in a private jet and a combat jet. He also showed Chang pictures of cars and a box of M&M's that he claimed he got from Air Force One.

Moustafa told Chang that S.D. was required to give him all the money that he made. Moustafa had also said that S.D. had been with "bad people" before and had a history of doing drugs. Oftentimes, Chang and Mejia would be at Moustafa's apartment when S.D. returned from work, and Moustafa always told S.D. to go to his room because S.D. was not permitted to sit in the living room with them. One day, Moustafa told Chang that S.D. had tried to rape his sister after Chang asked him why S.D. acted the way he did around the apartment. Chang saw that S.D. called Moustafa "sir" and bowed down to him.

Chang was once at Moustafa's apartment and saw that S.D. had a black eye. And in the fall of 2013, Chang and Mejia went to the grocery store where S.D. worked and saw that he had a reddish-brown mark between his eyebrow and his forehead. Because Moustafa had told her in the past of having "punished" S.D. "for doing bad stuff," Chang asked S.D. if Moustafa had caused the injury, and S.D. said that he fell because he was clumsy.

Chang and Mejia accompanied A.D. and Moustafa when they went to the police department to report S.D. missing. Before going to the police department, Chang and Mejia spent about two hours at Moustafa's apartment "[j]ust chatting." Chang did not hear Moustafa coach A.D. on what to say to the police.

8. *Detective Mason Motomura*

Mountain View Police Department Officer Mason Motomura was assigned to investigate Moustafa's case and interviewed S.D. at the police department on October 6, 2013. S.D. appeared hesitant and scared to speak with Motomura. At the end

13

of the interview, Motomura asked S.D. to call Moustafa. During the call, Moustafa generally denied hitting S.D. Motomura later took photographs of S.D. and his injuries.

That same evening, Motomura interviewed Moustafa. Moustafa said that A.D. was being abused by her family, and S.D. was "always acting sexually weird toward her." Moustafa said he got into a couple of fights with S.D. Moustafa had hit S.D. "really hard" several times and told him to stop touching A.D. Moustafa said that he caught S.D. masturbating to A.D.'s clothes. During the interview, Motomura directed Moustafa to write a short letter of apology to S.D., which he did.

At trial, Motomura explained that he did not download the content of S.D.'s cell phone because S.D. was the victim in the case. He also found S.D. credible, and he did not believe S.D. was hiding anything that would not be found on Moustafa's devices. Motomura, however, acknowledged that in general, information from cell phones "can be valuable for the prosecution just as it could be valuable for the defense."

**9.** *Forensic Evidence*

Following a search, several tools were recovered from Moustafa's apartment. S.D.'s DNA was found on the clamp end of a black Husky wrench. A.D.'s DNA was found on a Crescent wrench. A Crescent ratchet tested presumptively positive for blood that matched S.D.'s DNA. A piece of carpet from Moustafa's apartment tested presumptively positive for blood that also had some yellow stains that might be consistent with bleach. S.D.'s and A.D.'s DNA matched some of the bloodstains, though the amount of blood present was not "massive." Additionally, a bathmat tested presumptively positive for blood and matched S.D.'s DNA.

A criminalist examined an Apple laptop bearing a user account with Moustafa's name but found no photos or videos of S.D.'s injuries. The criminalist also examined an HP laptop, which belonged to S.D., and a desktop computer, finding no images of S.D. on those items. He did, however, later find some images depicting sadomasochism or torture on both the HP laptop and the Apple laptop.

14

**10.** *Intimate Partner Violence Expert*

Richard Ferry, a licensed marriage and family therapist, testified as an expert in domestic violence and intimate partner violence. According to Ferry, intimate partner violence can exist even if there is no sexual relationship between the perpetrator and the victim. Victims of intimate partner violence can have paradoxical behaviors, such as refusing to cooperate with the investigator or lying under oath about the violence. Victims sometimes stay with the perpetrator out of dependence or because their self-esteem has become so corroded that they are unable to leave the abusive situation. Traumatic bonding—or intense loyalty between the victim and perpetrator—may also occur. Stockholm syndrome, a subset of traumatic bonding, may also occur, during which a hostage-taker might offer small acts of kindness toward hostages, stimulating hope and increasing loyalty.

**C.** *The Defense*

The defense called several prosecution witnesses, including S.D. and Motomura. The defense also called several other witnesses on Moustafa's behalf.

**1.** *S.D.'s Family Friend*

S.D.'s family friend socialized with S.D.'s family through a local mosque. One day, S.D. and his parents came to the family friend's restaurant. The family friend noticed S.D. was walking "kind of funny," and S.D. said that he had been beaten. The family friend did not see any visible injuries, but he suggested that S.D. and his family go to the local hospital where they later saw Dr. Cader.

**2.** *Officer Joshua Walsh*

San Luis Obispo Police Department Officer Joshua Walsh was dispatched to the hospital in San Luis Obispo on October 5, 2013, and spoke to S.D. S.D. told Walsh that his parents had come to pick him up in Mountain View. S.D. also told Walsh that he had thought about jumping in front of a train to stop the torture, and that Moustafa had stuck a

15

small Statute of Liberty figurine into his anus to cause him pain. S.D. said that Moustafa had struck his toe with a hammer, causing the toenail to fall off.

### 3. *S.D. and A.D.'s Mother*

S.D. and A.D.'s mother did not like Moustafa and was afraid of him; Moustafa always used angry words and said he wanted to " 'kill [them].' " She also did not like that A.D. moved in with Moustafa because they were not married.

Between August 2012 through October 2013, S.D. and A.D.'s mother saw A.D. about three or four times a year. Moustafa may have brought S.D. with him once. S.D. and A.D.'s mother recalled that Moustafa accused S.D. of molesting A.D. And once, S.D. and A.D.'s mother observed Moustafa discipline S.D. by twisting his ear and slapping him.

S.D. and A.D.'s mother tried to dissuade A.D. from marrying Moustafa and tried to dissuade S.D. from moving in with Moustafa. S.D. and A.D.'s mother may have sent Moustafa a message apologizing to him and may have left him a voicemail, but she only did so because Moustafa would not otherwise let her see her children. Moustafa once said that he was sent from God to protect S.D. and A.D.

### 4. *Dr. Charles Moser*

Dr. Charles Moser, a physician, examined S.D.'s hospital records from October 2013 and testified as an expert in "describing, recognizing, and providing the likely cause of injuries." Based on the photographs, Moser opined that the injuries to S.D.'s nipples could be consistent with the use of pliers, and the injury to the penis looked like they were in the healing stage. The most serious injury he saw was the bruising to S.D.'s buttocks. Moser, however, opined that he did not see any injuries that were consistent with being hit with a crowbar, which would usually leave a more linear bruise.

16

### 5. *Apartment Neighbors*

The former apartment manager at Moustafa's building did not recall any yelling, screaming, or loud music coming from Moustafa's apartment between 2012 and 2013. None of the other tenants complained about Moustafa. The apartment manager, however, lived in a separate building and was unaware that anyone else lived in Moustafa's apartment.

Likewise, a neighbor who lived in the apartment next to Moustafa's did not recall any screaming or loud noises coming from Moustafa's apartment. The parties also stipulated that another neighbor would have testified that the individuals that lived in Moustafa's apartment were quiet, and there were never any loud noises or music coming from the apartment.

### 6. *Officer Terry Hoang*

Mountain View Police Department Officer Terry Hoang took down the missing person's report filed by A.D. when S.D. failed to return home in October 2013. A.D. did not mention that S.D. was involved in drugs or in a gang. Hoang also visited Moustafa's apartment. During the visit, Moustafa volunteered that S.D. was very clumsy, would bump into doors "20 times a day," and would sometimes come home with mysterious bruises.

### 7. *Sheryl Deaconson*

Sheryl Deaconson, a certified legal nurse consultant and administrative nursing supervisor, testified as an expert in hospital emergency room procedures. After reviewing S.D.'s hospital records, Deaconson opined that it was unusual that a SART nurse was not notified when S.D. reported a sexual assault. Deaconson also thought that the hospital records were oddly worded as they read like a narrative rather than focusing on S.D.'s injuries. Based on these irregularities, Deaconson opined that the hospital records were not typical in terms of how medical records are written, and S.D.'s treatment fell below the general standard of care.

17

**8.** *Jeff Fischbach*

Jeff Fischbach, a forensic technologist, testified as an expert in analyzing computers and data from computers. He examined the HP computer belonging to S.D. and found that there were issues regarding its examination. At one point, the computer stopped processing and did not keep image files. There were also controller failure issues, and a "hash" was canceled. There were also some issues with the examination of the Apple laptop belonging to Moustafa. Fischbach opined that based on the notes from the computer analysis, somehow the image files depicting torture were not found in 2014 but were found in 2017. Fischbach believed that unless something had been done to intentionally alter the computer files, some unintentional errors may have occurred when the computers were examined.[5]

**9.** *Stipulation*

The parties stipulated that if called to testify, a Mountain View Police Department officer would testify that he obtained a search warrant for A.D.'s and S.D.'s cell phones, but the cell phones were returned without further extraction or search.

**D.** *The Verdict, Motion for a New Trial, and Sentencing*

The trial court found Moustafa guilty of all charges and found true all enhancements as alleged in the information. The trial court later heard and denied Moustafa's motion for a new trial. Subsequently, on June 26, 2019, the trial court sentenced Moustafa to prison for an indeterminate term of 57 years to life, consecutive to a determinate term of 14 years and four months.[6] Moustafa timely appealed.

---

[5] The criminalist that analyzed the computers was later called as a rebuttal witness by the prosecution. He testified that he had recently "rehashed" the drives again, and the hash values were the same as the values obtained in 2013 and 2014, meaning that the image files depicting torture had not been forensically changed in the interim.

[6] The indeterminate term was composed of two consecutive terms of 25 years to life for sexual penetration (§§ 289, subd. (a)(1)(A), 667.61, subds. (a) & (d); counts 2 &

18

## II.    DISCUSSION

### A.    *Jury Waiver*

Moustafa claims that his waiver of trial by jury was inadequate because it is unclear whether the waiver was knowing and intelligent and made with full awareness of the rights that were being abandoned.  On the record before us, we conclude that the totality of the circumstances affirmatively show that Moustafa's jury waiver was both voluntary and intelligent.

#### 1.    *Background*

On November 1, 2017, the first day of trial, trial counsel stated that he intended to present Moustafa's waiver of his right to a jury trial, that he had discussed the waiver with Moustafa, and that it was Moustafa's wish to proceed by court trial.  After trial counsel commenced his voir dire of Moustafa on the jury waiver, the trial court asked if Moustafa needed some additional time to speak with counsel about the waiver and thereafter recessed to permit Moustafa to confer further with counsel.  Later, the trial court noted that the defense was not ready to proceed with the waiver and deferred the issue.

The following day, Moustafa's trial counsel indicated again to the court that his client intended to proceed with a court trial and waive his right to a jury.  The trial court asked Moustafa if it was his "wish to waive [his] right to a jury trial," and Moustafa answered yes.  The trial court then indicated that Moustafa's trial counsel would be asking him several questions about his understanding of what the jury waiver entailed.

---

3), consecutive to 7 years to life for torture (§ 206; count 3).  The determinate term was composed of the upper term of 12 years for human trafficking (§ 236.1, subd. (a); count 4), consecutive to 1 year (one-third the midterm of three years) for inflicting corporal injury on a spouse (§ 273.5, subd. (a); count 6), and two eight-month (one-third the midterm of two years) terms for criminal threats (§ 422; counts 5 & 6).

Trial counsel asked Moustafa to explain his understanding of a jury trial. Moustafa answered, "That the decision about my verdict, guilty or not guilty, would be based on 12 jurors, would be my peers." Asked what a court trial was, Moustafa answered that "[it] means the sole decision of the Judge concerning [*sic*] my verdict."

Trial counsel then asked whether Moustafa understood that a criminal defendant "has an absolute right to have a jury trial," and Moustafa answered that he did. Counsel asked Moustafa if anyone had ever put pressure on him to waive his right to a jury trial, and Moustafa answered no. Counsel also asked Moustafa if his decision to waive a jury trial was a "free and voluntar[y] decision," and Moustafa answered yes. And finally, counsel asked Moustafa if he had sufficient time to speak with counsel about his decision to waive his right to a jury trial, and Moustafa answered yes, also thanking the court for having given him additional time for that purpose.

The trial court then directly asked Moustafa several questions. The trial court asked Moustafa if he understood that he had the right to testify or to remain silent, irrespective of whether the trial was by jury or by the court, and Moustafa answered yes. He asked for clarification as to whether, if he chose to testify, he would nonetheless be permitted to stay silent as to individual questions. The trial court explained that if Moustafa chose to testify, he would be required to respond to "any reasonable question," but he could choose to remain silent by not testifying at all. Moustafa said that he understood this clarification. The trial court asked Moustafa if he understood he had the right to confront witnesses at either a jury or court trial, and Moustafa said yes.

The trial court then asked Moustafa if he had any further questions for either his attorney or the trial court. In response, Moustafa asked only for direction on how to communicate concerns that might arise during trial "in case something is not accurate or misstated." The trial court advised Moustafa to direct such concerns to his attorney.

Thereafter, the trial court accepted Moustafa's jury waiver.

20

## 2. *Legal Principles*

Under both the federal Constitution and the California Constitution, a defendant in a criminal prosecution has a right to a jury trial. (U.S. Const., amend. VI; Cal. Const., art. I, § 16; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*).) Nonetheless, a jury trial "may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) A defendant's waiver to a right to jury trial must be knowing and intelligent—meaning the waiver must be made with the understanding of the nature of the right being abandoned and the consequence of abandoning it—as well as voluntary. (*Sivongxxay*, *supra*, at p. 166.)

In *Sivongxxay*, the California Supreme Court offered "general guidance" to help ensure that a jury waiver is knowing and intelligent, and to facilitate resolution of challenges to jury waivers on appeal. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) In particular, *Sivongxxay* recommended that trial courts advise a defendant of the "basic mechanics of a jury trial waiver in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Ibid.*) *Sivongxxay* also recommended that the trial court take "additional steps" (*ibid.*) to ensure on the record that the defendant understands what the jury trial right entails by, for example, "asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, *or* by asking the defendant directly if he or she understands or has any questions about the right being waived" (*id.* at pp. 169-170, italics added).

21

*Sivongxxay*, however, emphasized that its guidance was "not intended to limit trial courts to a narrow or rigid colloquy" and was "advisory." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 170; accord, *People v. Daniels* (2017) 3 Cal.5th 961, 992-993 (conc. & dis. opn. of Cuéllar, J.) (*Daniels*).) Moreover, *Sivongxxay* reiterated that "a trial court's adaptation of or departure from the recommended colloquy in an individual case will not necessarily render an ensuing jury waiver invalid." (*Sivongxxay*, *supra*, at p. 170.) Thus, "[r]eviewing courts must continue to consider all relevant circumstances in determining whether a jury trial wavier was knowing, intelligent, and voluntary." (*Ibid.*, fn. omitted.)

A trial court's "failure to obtain a waiver of the right to trial by jury is reversible per se" as it is structural error. (*People v. Collins* (2001) 26 Cal.4th 297, 311.)

3.      *Analysis*

Moustafa makes no claim that his jury waiver was coerced or otherwise involuntary but maintains the record does not sufficiently demonstrate his comprehension of the jury right to establish an effective waiver. Based on the totality of the circumstances, we are satisfied that Moustafa's waiver was knowing and intelligent, as well as voluntary. (See *Sivongxxay*, *supra*, 3 Cal.5th at p. 170.)

Moustafa informed the trial court that he understood that he had an absolute right to a jury trial as a criminal defendant, that a jury trial would be before 12 of his peers, that a waiver of his right would mean the trial judge alone would determine his guilt or innocence. He confirmed his understanding that the exercise of other constitutional trial rights was not contingent upon his waiver of jury. He further confirmed having had sufficient time to consult with counsel as to the jury waiver. Although evidence received after the jury waiver indicated that Moustafa had come to the United States in 2007 and had no prior experience with the criminal legal system here, there is no indication Moustafa had any difficulty with the English language (unlike the defendant in *Sivongxxay*) or had trouble conversing with his counsel or the court. And although evidence received posttrial indicated that Moustafa was mentally ill and taking

22

medication at the time of trial, we distinguish mental illness from incompetency on this record:  as the trial court noted in denying Moustafa's motion for a new trial, the posttrial psychological evaluation reflected that Moustafa was alert, oriented, communicative, and appeared to be of above-average intelligence.

Moustafa argues that his case is similar to *People v. Jones* (2018) 26 Cal.App.5th 420 (*Jones*), in which the jury waiver was held to be inadequate.  *Jones*, however, is inapposite, as the two-question colloquy regarding the waiver there was so conclusory that it shed no light on what, if anything, the defendant understood of the jury right:  the prosecutor merely asked the defendant if she understood " '[her] right to a jury trial' " and " 'agree[d] to waive that right and have [the judge] sitting alone, decide the case.' " (*Id.* at p. 428.)  Thus, "the record [in *Jones* did] not show whether [the defendant's] attorney ever discussed with her the nature of a jury trial," and the trial court did not specifically advise the defendant of her right to a jury trial, only asking if she *understood* the right.  (*Id.* at p. 435.)  Acknowledging that "there is no rigid formula for what a jury advisement must include," the *Jones* court observed, "the record does not show whether Jones understood that a jury is comprised of individuals from the community instead of, for example, a collection of judges."  (*Id.* at p. 423; see also *id*. at p. 436 [the California Supreme Court "has consistently emphasized the importance of the defendant's knowledge that he or she has ' " 'the right to be tried by a jury of his [or her] peers.' " ' "].)  Therefore, the *Jones* court concluded that the record did not affirmatively show that the jury trial waiver was voluntary and intelligent.  (*Id.* at pp. 435-436.)

In contrast to *Jones*, Moustafa was not merely asked if he "understood" what a court trial entails:  he explained in his own words his understanding that the verdict in a jury trial would be decided by "12 jurors, . . . my peers," whereas in a court trial, the verdict would be "the sole decision of the Judge."  This alone would distinguish his waiver from *Jones*, where the record of the defendant's understanding of this basic distinction was silent.  Moreover, the record here is more expansive on the issue of

Moustafa's consultation with counsel about the right he was volunteering to waive. Moustafa affirmatively stated on the record that he had adequate time to discuss his waiver with counsel. In fact, at the hearing on November 1, 2017, the trial court interrupted counsel's colloquy with Moustafa to ensure that Moustafa could confer further with counsel. Moustafa's questions of the trial court during the waiver colloquy further indicated he anticipated active communication with counsel during the trial, suggesting that his out-of-court interaction with counsel was more than merely passive.

We note as well that by the time the defense proffered the jury waiver, Moustafa had been represented by a succession of attorneys. Before the trial court accepted the waiver, Moustafa demonstrated his readiness to convey—verbally or otherwise—when he wished to consult further with counsel: he specifically confirmed on the record that he had sufficient time to discuss the jury right with his counsel, even thanking the court for deferring consideration of the waiver for that purpose. Trial counsel, in initiating voir dire as to the waiver, likewise exhibited a clear understanding that the jury right is personal to the accused and not a matter within counsel's tactical discretion. And although Moustafa raised the adequacy of his jury waiver as a critical basis for his new trial motion, he submitted no evidence suggesting that trial counsel's advisement as to any aspect of the jury right or its significance had been incomplete or inadequate, in contrast to the affirmative evidence he proffered in support of other claims about his trial counsel's performance.[7]

The record here does not reflect two of the four express advisements "of the basic mechanics of a jury trial" which the California Supreme Court recommended but stopped

---

[7] As we discuss at II.C.3, *post*, trial counsel's performance was otherwise marred by a failure to obtain Moustafa's known mental health records. We accordingly considered whether this deficiency in performance as to the merits properly bears on our evaluation of Moustafa's jury waiver. For the reasons stated here, on this record and combination of circumstances, we conclude that it does not.

short of requiring in *Sivongxxay*—that a jury must be unanimous to reach a verdict and that a defendant has the right to participate in jury selection. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) But "under the totality of the circumstances standard, the presence or absence of a reference in a colloquy to [the unanimity of a jury], or to the impartiality requirement, is not necessarily determinative of whether a waiver meets constitutional standards." (*Id.* at p. 168; see also *People v. Weaver* (2012) 53 Cal.4th 1056, 1072-1074 [failure to advise defendant of right to participate in jury selection did not necessarily render jury waiver invalid].) As in *Daniels*, "[t]his case illustrates the difficulties that can arise on appeal" when the record does not unambiguously reflect an express " 'advise[ment] . . . of the basic mechanics of a jury trial in a waiver colloquy.' " (*Daniels*, *supra*, 3 Cal.5th at p. 1028 (conc. opn. of Kruger, J.).) But none of the several opinions in *Daniels* purported to repudiate *Sivongxxay*'s totality-of-the-circumstances test for a bright-line rule.

Under the totality of the circumstances here, we conclude Moustafa's waiver was knowing, intelligent, and voluntary, and there was no violation of his constitutional right to trial by jury. (See *Sivongxxay*, *supra*, 3 Cal.5th at p. 170.)

**B.**     *Admission of Moustafa's Prior Statements to the Police*

Moustafa next argues that the trial court erroneously admitted his statement to the police because Motomura continued to question him even after he invoked his right to counsel and because his statements were induced by promises of leniency. Before trial, Moustafa's counsel filed a motion to suppress his statements to Motomura. In part, Moustafa argued that Motomura failed to honor Moustafa's invocation of his right to an attorney. Moustafa also argued that Motomura affirmatively misled Moustafa about the law and his rights.[8] After conducting a hearing, the trial court found that Moustafa's

---

[8] We note that it appears that the specific claim of voluntariness that Moustafa now raises on appeal—that he was promised leniency by Motomura—was not raised

25

statement was knowing, intelligent, and voluntary and denied the motion to suppress. Based on our review of the record, we conclude that Moustafa's statements were properly admitted.

### 1. *Legal Principles*

" '*Miranda v. Arizona*, *supra*, 384 U.S. 436, and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. [Citations.] "If a suspect indicates 'in any manner and at any stage of the process,' prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated." [Citation.]' " (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).) "To establish a [waiver of *Miranda* rights], the [prosecution] must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*Williams*, *supra*, 49 Cal.4th at p. 425.)

Additionally, "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) A statement is involuntary " ' "if it is not the product of ' "a rational intellect and free will." ' " ' " (*Ibid.*) " 'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 347 (*McWhorter*).) However, the presence of coercive police activity does not necessarily compel a finding that a confession was involuntary—" 'the statement and the inducement must be causally linked.' " (*Ibid.*) The prosecution bears

---

below in the trial court. Typically, claims of involuntariness not raised below are deemed forfeited on appeal. (*People v. Williams* (2010) 49 Cal.4th 405, 435.) However, even if we assume that there was no forfeiture, we find Moustafa's claim of involuntariness to be without merit as explained below.

26

the burden to establish by a preponderance of the evidence that a defendant's confession was voluntary.  (*Linton*, *supra*, at p. 1176.)

"In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' " (*Duff*, *supra*, 58 Cal.4th at p. 551.)  If, as here, the interview was recorded, "the facts surrounding the admission or confession are undisputed and we may apply independent review." (*Ibid.*)

### 2.	*Invocation of the Right to Counsel*

#### a.	*Background*

Motomura interviewed Moustafa at the police station.  Before Motomura started asking Moustafa any substantive questions, he told Moustafa that he wanted to get Moustafa's side of the story and advised Moustafa of his rights as follows:  "You have the right to remain silent.  Anything you say may be used against you in court.  You have the right to the presence of an attorney before and during any questioning.  If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want one.  You understand?"  Motomura also told Moustafa that he would give Moustafa a written advisement to read and—"if you understand them"—to sign.

Thereafter, the following colloquy took place:

"[Moustafa:]   So if I want an attorney right now I can't have one right?

"[Motomura:]  Um, if you—yes.  You—you can't have an attorney physically present here with you right now.  But if you wanna have one before you talk to me, that is your choice but we're not gonna talk before you go to jail.  If you do wanna talk to me before you go to jail, then you need to say, um, yes that you understand your rights and you wanna talk to me."

27

Subsequently, Moustafa asked Motomura if he could call his fiancée. Motomura responded that he would be given the opportunity to use the phone at jail, but he probably would not have time to use the phone because it was already "very late." Moustafa expressed fear about going to jail and asked Motomura if he was going to be "amongst criminal[s]" and if he was "gonna get raped."

Motomura told Moustafa that he just wanted to get to the truth and hear Moustafa's side of the story. He then advised Moustafa that in order to ask him questions, Motomura had to ensure that Moustafa understood the rights he had read earlier. Moustafa asked, "So if I wanna wait for that attorney, I have to go to jail and come back or you will visit me in jail?" Motomura replied, "Um, if you wanna wait for the attorney, either you're gonna go to jail either way." Moustafa told Motomura that he was not from the United States, and he was asking Motomura to help him out.

The following colloquy then took place:

"[Motomura:] So well from my point of view, I know that you're—you're not a criminal. I know that you've never been arrested before. I know that people make mistakes. I know there is probably a reason for what happened but like I said, I would love to know that reason but I just need you to tell me that you understand your rights and that it's okay for me to ask you those questions so I can find out what happened.

"[Moustafa:] Of course I understand you.

"[Motomura:] Okay.

"[Moustafa:] If you cannot afford an attorney—I want an attorney but I don't wanna wait indefinitely—and then my—my phone, did you go through it?

"[Motomura:] Um, I have not done anything with your phone."

Motomura then went on to explain that Moustafa's phone had been listed on a search warrant, which meant that a judge had signed an order and had given permission to search Moustafa's phone.

Motomura then asked Moustafa, "Do you have any questions about what's on the [*Miranda*] card?" The following conversation then took place:

"[Moustafa:] I want to ask for an attorney but I'm just scared.

"[Motomura:] Okay. The…

"[Moustafa:] I mean the—what you can, if you ask me a question, can I tell you after that I want to get an attorney?

"[Motomura:] Yeah.

"[Moustafa:] Okay. I, uh…

"[Motomura:] So for the first stuff that I just need to make sure you don't have any questions about the card.

"[Moustafa:] No.

"[Motomura:] You understand that? Okay. So yeah. Just sign right there."

Subsequently, Moustafa signed the *Miranda* card. Thereafter, Motomura said: "I would like to get your side of the story. I just wanna find out the truth. If I ask you any questions that are uncomfortable, then you can always let me know. . . . [¶] . . . [¶] . . . I don't wanna talk anymore. I want my attorney. You understand?" Moustafa nodded and thereafter submitted to the interview.

### b. *Analysis*

Preliminarily, we observe that both Moustafa and the Attorney General analyze the issue as whether Moustafa's references to an attorney constituted unambiguous post-*Miranda* invocations to the right to counsel. Moustafa argues that his statements were obtained in violation of *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), which held that once a defendant has validly waived his or her *Miranda* rights and thereafter requests counsel, he or she "is not subject to further interrogation by the authorities until counsel has been made available to [him or her], unless the accused . . . initiates further communication, exchanges, or conversations with the police." (*Id*. at pp. 484-485.)

29

*Edwards*, however, is inapplicable. Here, Moustafa did not affirmatively waive his *Miranda* rights until he signed the written *Miranda* advisement, which took place after he made multiple references to an attorney. Thus, Moustafa's references to his right to counsel did not occur postwaiver but during his *initial* waiver of his *Miranda* rights. Our Supreme Court has instructed that whether a suspect has made an initial waiver of Miranda rights is an inquiry distinct from that contemplated in *Edwards*. (See *Duff*, *supra*, 58 Cal.4th at p. 552 [when a "reference to a lawyer occur[s] at the beginning of questioning, the rules respecting pre-*Miranda* waiver invocations apply"].)

Specifically, when a defendant makes an initial reference to counsel, "an officer is permitted to clarify the suspect's intentions and desire to waive his or her *Miranda* rights." (*Duff*, *supra*, 58 Cal.4th at p. 553.) The standard for assessing an ambiguous initial reference to the right to counsel is objective, and "asks what a reasonable officer would have understood the nature of the suspect's request to be under all the circumstances." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217-218 (*Sauceda-Contreras*).) "With respect to an initial [*Miranda*] waiver . . . '[a] valid waiver need not be of predetermined *form*, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision.' " (*Williams*, *supra*, 49 Cal.4th at p. 427.)

In this case, Moustafa concedes his first two references to retaining an attorney were ambiguous at best because they were prefaced with "if" and concerned whether he would get an attorney immediately or after he went to jail.[9] Moustafa, however, argues that his latter two references to his right to an attorney were not equivocal at all because they were not qualified with emotional or conditional language such as "if" or

---

[9] Notably, Motomura told Moustafa that he would be going to jail regardless of whether he requested an attorney.

30

"maybe"—in the latter two instances, Moustafa stated that "I want an attorney but I don't wanna wait indefinitely," and "I want to ask for an attorney but I'm just scared."

Although we agree with Moustafa that his first two references to an attorney were equivocal, we disagree with his assessment that his latter two references to an attorney were unambiguous. Moustafa takes his own words out of context. When Moustafa stated that he wanted an attorney but did not want to wait indefinitely, he immediately followed up his comment by asking Motomura about his cell phone. Motomura answered Moustafa's question about his cell phone and asked Moustafa again if he had any questions about the *Miranda* card. At that point, Moustafa replied, "I want to ask for an attorney, but I'm scared." Motomura started to reply, "Ok," but Moustafa interjected and asked, "I mean the—what you can, if you ask me a question, can I tell you after that I want to get an attorney?" Motomura said "Yeah." Motomura then asked if Moustafa had any questions about what was on the written *Miranda* advisement, and Moustafa replied no.

Under these circumstances, a reasonable officer might have been uncertain about whether any of Moustafa's references to an attorney were intended to invoke his right to counsel. (See *Williams*, *supra* 49 Cal.4th at p. 429.) And, finding the reference ambiguous, Motomura was entitled to clarify Moustafa's intentions. (*Duff*, *supra*, 58 Cal.4th at p. 553.) Here, Motomura did not ask Moustafa any substantive questions after Moustafa referenced obtaining an attorney; Motomura merely continued to speak with Moustafa and answered questions that Moustafa had about his case and the interview process. In other words, Motomura lawfully " 'proceeded to talk to [Moustafa] to see whether or not he wanted to talk without having to ask him specifically to clarify his ambiguous statement any more than he did by continuing to talk.' " (*Id.* at p. 554.) Moustafa also appeared to later clarify his position on waiving his *Miranda* rights when he asked Motomura if he could request an attorney after Motomura started to ask questions, and Motomura replied yes. Moustafa then signed the written *Miranda*

31

advisement and started to answer Motomura's questions, implying that he intended to waive his rights. (See *Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 221 [expressed willingness to answer questions after acknowledging *Miranda* rights has been held sufficient to constitute implied waiver of rights].)

Arguing otherwise, Moustafa relies in part on *People v. Henderson* (2020) 9 Cal.5th 1013 (*Henderson*), which like *Edwards* involved a post-*Miranda* waiver invocation of the right to counsel. In *Henderson*, after expressly waiving his *Miranda* rights both orally and in writing, the defendant later invoked his right to counsel by stating, " '[w]ant, uh, want to speak to an attorney first, because I, I take responsibility for me, but there's other people . . . .' " (*Id.* at p. 1020.) The officers conducting the interview did not acknowledge the defendant's invocation and continued to ask him questions. (*Id.* at p. 120-121.) The California Supreme Court held that the defendant's subsequent statements were admitted in violation of *Miranda* and *Edwards*. (*Henderson*, *supra*, at p. 1022.)

We find *Henderson* distinguishable both because it involved a *postwaiver* invocation of the right to counsel and because that postwaiver invocation was unambiguous.[10] Second, in *Henderson*, the defendant unambiguously stated he wanted an attorney " 'first' " and further attempted to explain why he wanted to speak to an attorney before continuing with questioning. (*Henderson*, *supra*, 9 Cal.5th at pp. 1023-

_____

[10] Likewise, we find unpersuasive Moustafa's reliance on cases like *Sessoms v. Grounds* (9th Cir. 2015) 776 F.3d 615, which also involved a postwaiver invocation of the right to counsel. As we have stated, when a defendant makes an initial equivocal reference to counsel, "an officer is permitted to clarify the suspect's intentions and desire to waive his or her *Miranda* rights." (*Duff*, *supra*, 58 Cal.4th at p. 553.) That is what was done here—after Moustafa made his statements, Motomura did not proceed to ask him about what happened with S.D. or A.D. Rather, Motomura continued to answer Moustafa's questions about his right to counsel and whether he understood that questioning could stop immediately and resume only after he had counsel.

1024.) The Supreme Court rejected the notion that the defendant's adding he also wanted to accept responsibility made this request ambiguous: "There is nothing inconsistent or ambiguous about wanting to speak to an attorney before taking responsibility, and defendant made clear that he wanted to speak to an attorney 'first.' One can take responsibility in ways other than giving an uncounseled confession to the police." (*Ibid.*) In contrast, Moustafa qualified his stated desire for an attorney by saying unequivocally "I don't want to wait indefinitely" and by asking follow-up questions to Motomura about whether he would be able to request an attorney after the interview started, suggesting that he was still evaluating whether to invoke his rights. Unlike *Henderson*, Moustafa's request was ambiguous and did not clearly reflect an intent to request counsel.

In sum, the record reflects that Moustafa, after having clarified with Motomura that he could still request an attorney even after the questioning started, was willing to proceed with the interview without a lawyer present. Under the totality of the circumstances, we determine that Moustafa's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. (See *Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 221.)

### 3. *Voluntariness*

#### a. *Background*

In the beginning of Moustafa's interview, before Motomura read him his *Miranda* rights, Moustafa said that earlier that night, he had "cried," "freaked out," and "prayed." Moustafa asked Motomura if he was "gonna get locked up for life," and the following colloquy occurred:

"[Motomura:] Um, I can't answer that—now 'cause, uh, not that the court. All I'm trying to do is gather the truth about what happened. So I'd like to talk to everybody involved.

"[¶] . . . [¶]

"[Moustafa:] Um, am I—am I gonna lose everything? I have like if I go to jail, like am I gonna be in jail indefinitely?

33

"[Motomura:]  Like I said I can't answer that 'cause I'm not the—I'm not the judge.  And that's up to the Court to decide.  All I'm here to do is gather the truth about what happened.

"[Moustafa:]  And then…

"[Motomura:]  And send my report to the court and then . . .

"[Moustafa:]  From if—if . . .

"[Motomura:]  . . . they're decide from there.

"[Moustafa:]  From your experience like do people go to life for jail for that?

"[¶] . . . [¶]

"[Motomura:]  . . . as far as I know what you've been accused of no it would not be a life sentence as you say.  [¶] . . . [¶] But as far as the exact years, I don't know.  That's again up to the Court and the district attorney.

"[Moustafa:]  You said years?

"[Motomura:]  Yeah I don't know, I'm letting you know I don't know the amount.

"[Moustafa:]  Can I know what I'm accused of?

"[Motomura:]  Yes.  Um, off the top of my head I'll say making threats, mmm sexual assault, battery, there might be more but that's what I can think of off of the top of my head.

"[Moustafa:]  And though who put those charges against me?

"[Motomura:]  Um, well I'm not sure what you mean by that.

"[Moustafa:]  No I mean . . . .

"[Motomura:]  I'm—I'm the one who is in charge of deciding what you're being charged with.

"[Moustafa:]  No but I mean somebody came to you and told you something to put me in charge?

34

"[Motomura:] Yeah. But I'm not, uh, I'm not obligated to tell you who made the report. We have to protect the—right, the privacy of the people who make a report. Okay?"

Motomura subsequently read Moustafa his *Miranda* rights. Moustafa expressed concerns about going to jail, stating, "I'm—I'm yeah, sure, am I gonna be, uh amongst criminal and I'm gonna get raped?" Motomura replied, "Um, all I can say is at the jail, they treat[,] the people that work there treat the prisoners with the same respect that they give them. So I would say that you will be kept safe and you won't be harmed as long as you're respectful with them and the same way you're being respectful with us. And if you're put with anybody that you're concerned about, and you would let them know and they would separate you from that person."

Afterwards, Moustafa said, "I'm not from this country and all I'm asking you is just to help me out. I-I-I don't have any background about this. I have never done anything bad in my life. I'm sure you checked my record." Motomura replied, "So well from my point of view, I know that you're—you're not a criminal. I know that you've never been arrested before. I know that people make mistakes. I know there is probably a reason for what happened but like I said, I would love to know that reason but I just need you tell me that you understand your rights and that it's okay for me to ask you those questions so I can find out what happened."

Later, during the interview, Moustafa twice referenced Motomura's statement that he did not believe Moustafa was a criminal, saying, "I really appreciate that you're not calling me a criminal," and, "Then what you told me I'm not a criminal liar. I appreciate it but that's not probably how the court is gonna look at me." Motomura did not directly address Moustafa's comments when he made them.

Toward the end of the interview, after Moustafa had stated that he had struck S.D. several times, Moustafa again asked Motomura about what sentence he would face, and the following colloquy took place:

35

"[Moustafa]:  Do you think—do you think with all those evidence with your experience, am I like gone for life?

"[Motomura:]  Mmm in my experience the only thing that they would send you to prison for life at your age was—if you killed somebody.  So the best of my knowledge when you ask me am I gonna go to prison for life, my answer would be no.  But how many months, years, and all that stuff completely up to the court.  So it'd be irresponsible for me to guess for you."

And finally, as they were ending the interview, Moustafa asked Motomura if what he had done was "extremely severe" or "horrible."  Motomura replied, "Um, so the lowest crime is a misdemeanor, right?  So a misdemeanor might be you steal, um, like a DVD from the store.  The highest one is gonna be murder right?  Which you could be sentenced to death, you could be sentenced to life in prison.  Yours are in between that.  So that's about all I can say.  You know?  Not the worst but it's not the lowest.  And they'll take into account your record too so since you have never been in trouble before, that'll be to your benefit.  Um, they read the report and they think that you've been cooperative.  I think that will be to your benefit."

b.     *Analysis*

Moustafa argues that the trial court erred by admitting his statements to Motomura because they were not voluntary and were induced by promises of leniency.  Moustafa argues that the interview took place at 4:45 a.m., after he had already been held for three hours, he was upset and emotional, and he repeatedly demonstrated that he was scared as he asked whether he would be sent to prison for life.  Moustafa insists that Motomura's statements expressly and impliedly promised leniency because he assured Moustafa that he would not get a life sentence and falsely asserted that Motomura was in charge of what crimes Moustafa would be charged with.

First, the record does not reflect that Motomura assured Moustafa that he would not get a life sentence.  Moustafa asked Motomura about what his potential sentence

36

would be in the beginning of the interview, but Motomura declined to give an exact estimate and stated that Moustafa's eventual sentence would be "up to the Court and the district attorney." Although Motomura stated that he did not think Moustafa would receive a life sentence for his crimes, he qualified his statements by asserting that it was "as far as [he] knew" and it was to "the best of [his] knowledge" and that ultimately, again, Moustafa's sentence would be "up to the Court and the district attorney." There was no express or implied promise of leniency in terms of the sentence he would face. (See *People v. Tully* (2012) 54 Cal.4th 952, 993-994 [police made no promise of leniency by telling defendant that he might qualify for witness protection if he was being truthful].)

Moreover, the second time that Motomura said that he did not think Moustafa would receive a life sentence was at the end of the interview, *after* Moustafa had already said that he had hit S.D. As a result, this second statement could not have induced Moustafa's prior statements, and we decline to consider it in our analysis of voluntariness. (See *McWhorter*, *supra*, 47 Cal.4th at p. 347 ["the statement and the inducement must be causally linked"].)

Nor was there an express or implied promise that Motomura would decline to charge Moustafa with crimes if he proceeded with the interview. Moustafa argues that Motomura's statement, "I'm the one who is charge of deciding what you're being charged with," combined with Motomura's later comment that he did not believe Moustafa was a criminal, necessarily suggested to Moustafa that Motomura would not be charging Moustafa with crimes because Motomura did not believe Moustafa's actions to be criminal. Moustafa, however, takes Motomura's statements out of context. When Motomura stated that he did not think that Moustafa was a criminal, Motomura did not say that he thought that the allegations in the current case did not arise to the level of criminal conduct. Rather, Motomura specified that, "you're not a criminal" and qualified

37

that he knew that Moustafa did not have a criminal record, that "people make mistakes," and that "there is probably a reason for what happened."

And although Motomura erroneously informed Moustafa that he was "in charge of deciding" what Moustafa would be charged with, Motomura did not suggest that Moustafa would receive lenient treatment by speaking with Motomura or that Moustafa's "mistakes" would somehow not be punishable as crimes. (*People v. Holloway* (2004) 33 Cal.4th 96, 116 [detective's suggestion that the killings might have been accidental and that such circumstances " 'make[] a lot of difference,' " fall short of being promises of lenient treatment in exchange for cooperation]; see also *Miller v. Fenton* (3d Cir. 1986) 796 F.2d 598, 612 [officer's remark that defendant was not a criminal did not affect voluntariness of confession].) It is also not "inherently coercive for an interrogator to attempt to form a rapport with the suspect." (*Williams*, *supra*, 49 Cal.4th at p. 447.)

Nor was it coercive for Motomura to encourage Moustafa to tell his side of the story. To the extent, if any, that Motomura implied that Moustafa might receive some benefit if his actions were unintentional, pointing out the "benefit that might naturally flow from a truthful and honest course of conduct" does not constitute a promise of leniency. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1204; see also *People v. Carrington* (2009) 47 Cal.4th 145, 174 [no promise of leniency when officers did not suggest they could influence the district attorney's decision and merely informed defendant that full cooperation "might be beneficial in an unspecified way"].) " 'No constitutional principle forbids the suggestion by the authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence,' " and "law enforcement officers are permitted to urge that it would be better to tell the truth." (*Williams*, *supra*, 49 Cal.4th at p. 444.)

For example, in *People v. Vance* (2010) 188 Cal.App.4th 1182, 1212, the First Appellate District held that it was not coercive for officers to tell a defendant that they are " 'here to listen and then to help you out,' " or to tell a defendant that " 'the

38

court . . . wants to know what the real story is and you're the only one to provide that.' " (*Ibid.*) In that scenario, "the only benefits promised by the officers was the peace of mind defendant and the others would have after he did the right thing and gave his side of the story." (*Ibid.*) Likewise here, Motomura's encouragement to Moustafa to tell his side of the story did not impair the voluntariness of his subsequent statements.

Moustafa, however, argues that Motomura "assured" him that he was facing less serious charges. Yet the record belies this claim—when asked by Moustafa, Motomura responded that Moustafa was facing charges of "making threats, . . . sexual assault, battery," but that "there might be more [charges] but that's what I can think of off of the top of my head." In other words, Motomura explicitly qualified that the list of charges he gave to Moustafa was non-exhaustive, and there might be additional charges that Moustafa could face. Motomura also did not expressly or impliedly assure Moustafa that those would be the *only* charges he would face.

In part, Moustafa relies on *People v. Perez* (2016) 243 Cal.App.4th 863, which we find distinguishable. In *Perez*, the defendant denied knowledge of the murder until one of the officers told him that if he were honest and told the truth, the officers were " 'not gonna charge [him] with anything.' " (*Id.* at p. 876, italics omitted.) The officer also gave defendant his " 'word' " that the defendant would have his " 'life' " if the defendant cooperated with the police. (*Ibid.*) Immediately thereafter, the defendant confessed his involvement in the crimes. (*Ibid.*) Unlike *Perez*, Motomura at no point made an express, or even an implied, promise that Moustafa would not be charged with any crimes if he answered Motomura's questions or told his side of the story.

For these same reasons, *United States v. Lall* (11th Cir. 2010) 607 F.3d 1277, upon which Moustafa relies, is similarly distinguishable. In *Lall*, the officer expressly assured the defendant that anything he said would not be used to prosecute him. (*Id.* at p. 1287.) No similar assurances were made by Motomura in this case.

39

*People v. Cahill* (1994) 22 Cal.App.4th 296, is also inapposite. There, an officer assured a defendant that the death penalty was "inoperative" and gave the defendant descriptions of the law of murder but omitted a description of felony murder. (*Id.* at p. 315.) The *Cahill* court found this omission "materially misleading" because it made "more plausible the implicit promise that a first degree murder charge might be avoided if there was a confession showing no premeditation." (*Ibid.*) Motomura in this case did not claim to provide Moustafa a list of *all* the charges he was facing. And, as we have stated, Motomura said he did not think Moustafa would face a life sentence, but he conditioned his statement by saying that it was only "as far as [he] kn[e]w" and that the exact sentence would be up to the court.

Moustafa also points out that coercive tactics can include promises to protect a suspect from harm, citing to *Arizona v. Fulminante* (1991) 499 U.S. 279. In *Fulminante*, the defendant was receiving " ' "rough treatment from the guys" ' " in prison, and an officer, using knowledge of these threats, offered to protect the defendant in exchange for a confession to a murder. (*Id.* at p. 286.) Moustafa analogizes his case to *Fulminante* and argues that he expressed concerns about being harmed or raped in jail and Motomura offered him assurances that he would not be harmed. Motomura, however, did not promise Moustafa protection during his incarceration in exchange for a confession. Addressing Moustafa's concern about his safety in jail, Motomura told Moustafa that "the people that work there treat the prisoners with the same respect that they give them" and that Moustafa would be kept safe "as long as you're respectful with them and [*sic*] the same way you're being respectful with us." This was no promise of protection in exchange for a confession; it was a general statement that Moustafa's safety in custody would depend on "the people that work there."

Finally, Moustafa suggests that his physical state and his characteristics at the time of the interview contributed to the involuntariness of his statements. He argues that he was held for several hours before the interview took place at 4:45 a.m. in the morning,

and the interview itself took several hours. At the beginning of the interview, Moustafa claimed that he had been upset, and he wanted to speak with his "fiancé," but Motomura later told him that it might be too late to call anyone.

Although we agree that "[o]ur voluntariness determination rests on an 'independent' consideration of the entire record, including ' " 'the characteristics of the accused and the details of the encounter,' " ' " the totality of the circumstances in this case do not suggest that Moustafa's will was overborne when he made his statements. (*People v. Mendez* (2019) 7 Cal.5th 680, 698-699.) At the beginning of the interview, officers asked Moustafa if he needed to go to the bathroom or needed water. (See *People v. Neal* (2003) 31 Cal.4th 63, 83-84 [circumstances of interview weighed against voluntariness of statement when defendant was confined incommunicado for 24 hours, was not taken to the bathroom or given water until the next morning and was placed in a cell without a sink or a toilet].) Although English was not Moustafa's native language, there is no indication that he had difficulty understanding Motomura or his questions. There is also nothing in the record to indicate that Moustafa was of low intelligence or had minimal education, nor does the record reflect that Motomura badgered or used any heavy-handed tactics on Moustafa to get him to talk or that Moustafa's fearfulness pressured him into the interview. (See *People v. Wall* (2017) 3 Cal.5th 1048, 1067 [detectives described the defendant as stressed or scared but defendant's answers appeared coherent and deliberate].)

Additionally, even if we assume that the general circumstances surrounding the interview weighed against a finding of voluntariness, "no single factor is dispositive in determining voluntariness." (*People v. Williams* (1997) 16 Cal.4th 635, 661.) Having reviewed the entirety of the interview and given that there was no express or implied promise of leniency, we conclude that Moustafa's statements were voluntarily made based on the totality of the circumstances, as it does not appear that Moustafa's will was

41

overborne. (See *Duff*, *supra*, 58 Cal.4th at p. 551; *Linton*, *supra*, 56 Cal.4th at p. 1176.) The trial court thus did not err in admitting Moustafa's statements.

## C. *Ineffective Assistance of Counsel*

Moustafa raises multiple arguments pertaining to his trial counsel's allegedly ineffective assistance during his trial. He argues that trial counsel failed to adequately investigate his mental health, which precluded him from presenting a defense of diminished actuality or pursuing a theory that he was not guilty by reason of insanity. He also argues that trial counsel failed to investigate and present evidence of his good character for non-sexual deviancy, failed to investigate and present evidence of his character for nonviolence, and failed to seek sanctions for law enforcement's failure to retain S.D. and A.D.'s cell phones. As we explain, to the extent counsel's performance was deficient, Moustafa does not establish prejudice on this record.

### 1. *Legal Principles and Standard of Review*

To establish a violation of the right to effective assistance to counsel under the Sixth Amendment, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the defendant was prejudiced by counsel's acts or omissions. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) A defendant is prejudiced if it is reasonably probable that in the absence of counsel's errors, the result of the proceeding would have been different. (*Id.* at p. 694.)

Several of Moustafa's claims of ineffective assistance were previously raised in his motion for a new trial. Although a claim of ineffective assistance is typically " 'more appropriately decided in a habeas corpus proceeding,' " a defendant may also raise a claim of ineffective assistance of counsel in a motion for a new trial and "a trial court should rule [on the motion] '[i]f the court is able to determine the effectiveness issue on such motion.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) Typically, a trial court has broad discretion when ruling on a new trial motion and its ruling will not be disturbed on appeal absent an abuse of discretion. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 730.)

However, when we review the trial court's denial of a new trial motion on the ground of ineffective assistance of counsel, we apply a mixed standard of review—we defer to the trial court's factual findings if supported by substantial evidence and review de novo the issue of whether the defendant's Sixth Amendment right to effective assistance was violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725 (*Taylor*).)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

### 2. *Evidence of Moustafa's Mental Health, the New Trial Motion, and Supporting Documents*

Before trial, Moustafa filed a motion to set bail, attaching a February 2017 psychological report prepared by Dr. Martin Williams.[11] Retained "to carry out an objective psychological evaluation of Mr. Moustafa with special attention to risk of re-offending," Williams reviewed the following documents provided by Moustafa's defense counsel: a list of Moustafa's criminal charges as of February 2015, an April 2014 letter from the district attorney to Moustafa's then-counsel "regarding evidence," and the Mountain View Police Department's combined case report. According to Williams, Moustafa's mental health history was limited to seeing a therapist in Santa Barbara between 2009 and 2010, with treatment "focused on stress reduction." Based on his "one two hours [*sic*]" interview with Moustafa in jail as well as his review of the "relevant documents," Williams found no basis to diagnose Moustafa with any mental health

---

[11] We grant the Attorney General's unopposed motion to augment the record to include Williams's report. (See Cal. Rules of Court, rule 8.320(b)(13)(A).)

43

condition. Williams also found Moustafa not to be at risk for reoffending. The trial court, however, denied Moustafa's motion to set bail.

After he was convicted of all the charged offenses, Moustafa filed a motion for a new trial. In his motion for a new trial, Moustafa argued that there was ample evidence that he suffered from mental illnesses that would have negated the specific intent required for his convictions for torture, sexual penetration, human trafficking, and the torture enhancements alleged in his case and that would have supplied a basis for him to pursue an insanity defense. He also argued that trial counsel was ineffective for failing to introduce evidence of his non-sexual deviancy and for failing to investigate and introduce good character evidence.

Moustafa attached multiple exhibits to his new trial motion. One exhibit was a psychological evaluation, dated February 2019, completed by psychologist Dr. Jeremy Coles. Coles evaluated Moustafa for five hours in January 2019 while he was in custody and also reviewed Moustafa's medical history. According to Coles's report, Moustafa had previously been on antidepressants, had been diagnosed with major depression and a panic disorder, and had previously attempted suicide. In November 2013, while Moustafa was in county jail pending trial on his current convictions, he was referred to mental health services for anxiety and was later diagnosed with posttraumatic stress disorder. He was subsequently prescribed medication for depression and for "psychotic symptoms."

Based on the available information, Coles determined that Moustafa was suffering from bipolar disorder "with a significant psychotic component involving grandiose and paranoid delusions." Although Moustafa denied ever physically abusing or torturing S.D., Coles also determined that the disorder "played a role in the commission of the controlling offenses" and that in Moustafa's mind, he was saving A.D. from a sexual assault. According to Coles, Moustafa "became solely focused on preventing [A.D.] from being raped and, in his mind, anything he did to prevent this was justified." Coles

also opined that there was "precious little evidence to suggest that . . . Moustafa's behavior at the time of the controlling offense was motivated by sexual concerns, i.e., a deviant sexual arousal pattern . . . ." Coles further found that Moustafa was "a man [de]void of any signs of sexual deviancy or abnormality in his psychological and sexual functioning that might otherwise predispose him to commit a sadomasochistic, sexually motivated assault."

Moustafa also attached a declaration prepared by Marlyn Schulz, a paralegal employed by his new attorney (his appellate counsel here), whom Moustafa retained to file the new trial motion. According to Schulz's declaration, appellate counsel discussed with trial counsel the decision not to pursue a mental health defense at trial. Following this discussion, appellate counsel drafted a declaration for trial counsel to sign that would have explained that trial counsel "did not obtain [Moustafa's] medical and mental health records before trial" and did not "investigate a mental health defense based upon diminished intent or insanity." Trial counsel, however, never signed the prepared declaration.

Attached to the new trial motion was a signed letter written by trial counsel that explained his decision not to pursue a mental health defense. Trial counsel acknowledged: "I did not investigate a mental health defense because I did not believe that Mr. Moustafa had either a diminished intent, was legally unconscious or was insane." He also stated that he "did obtain [Moustafa's] *medical* records" (italics added), which related to a surgery that Moustafa underwent, and he ultimately concluded that these records were not relevant to the issues raised at trial. Trial counsel further stated: "The defense was always that [Moustafa] did not torture [S.D.], that he did not threaten to kill him or cause serious bodily injury to him or that he was engaged in human trafficking."

In the same letter, trial counsel explained his decision not to introduce character evidence as follows: "I was aware that . . Moustafa was well liked by managers as well as hotel guests at the various hotels he was employed by in the past. It was my decision

not to present any character evidence due to my concern that this would 'open the door' to the admission of evidence regarding dishonesty or other damaging evidence."

Subsequently, appellate counsel prepared a second declaration incorporating the assertions made by trial counsel in his letter. As drafted, the new declaration again reiterated that trial counsel "did not obtain [Moustafa's] mental health records before trial" but that trial counsel had "obtained medical records related to [Moustafa's] surgery . . . ." Trial counsel did not sign the new declaration but responded by e-mail that he believed that he had "sufficiently explained [his] thought process regarding certain tactical decisions made during [his] representation of [Moustafa]."

Also attached to the motion was a transcript of an interview between Moustafa's ex-wife Lauren and the police. In her interview, Lauren stated that Moustafa had severe depression, had been diagnosed with "other disorders" in the past, and had previously attempted suicide.

Later, Moustafa submitted a reply to the prosecutor's opposition to his new trial motion that included a letter written by Coles further clarifying his original opinion. In the letter, Coles wrote that "it is most often the case that mania or any severe emotional state compromises one's ability to think rationally." Coles noted that Moustafa had "strong delusions that disallowed him from appreciating consensual reality" and that in such a state, "a person's decisional capacities are deficient as they are making decisions based upon a faulty apprehension of reality. Likewise, the planning of one's actions is dominated by unrealistic, in this case, delusional concerns and one weighs the consequences of one's actions, if at all, i[n] light of these same concerns." For example, Coles noted that someone in the midst of a manic episode might engage in activities that " 'have a high potential for painful consequences.' "

After hearing argument from the parties, the trial court denied Moustafa's motion for a new trial without holding a further evidentiary hearing. In part, the trial court noted that it found credible trial counsel's representation that he chose not to pursue a mental

health defense because he believed Moustafa was not legally insane and did not have a diminished intent. The trial court also stated that it believed a mental health defense would have "diluted" Moustafa's defense at trial that he did not inflict the injuries on S.D. Thus, the trial court held that trial counsel's tactical choices were reasonable and that Moustafa suffered no prejudice. As for trial counsel's failure to introduce good character evidence, the trial court concluded that trial counsel's decision not to introduce the evidence was reasonable given that introducing character evidence could have opened the door to the admission of evidence regarding Moustafa's dishonesty.[12]

After the trial court denied Moustafa's motion for a new trial, Moustafa filed a motion for reconsideration. Attached to the motion for reconsideration was email correspondence between his then-counsel and Moustafa's father dated February 2014.[13] In an email, Moustafa's father stated that Moustafa had been a victim of an assault in 2005, after which he spent 10 days in a psychiatric hospital in France. Moustafa's father also noted that Lauren had stated that Moustafa "stayed 2 times in a psychiatric hospital while they were married." Moustafa's father suggested that "we can say that [Moustafa] suffers from psychological problems and that he was not normal in his dispute with

---

[12] Moustafa has raised these same claims of ineffective assistance on appeal. As we have stated, we defer to the trial court's factual findings as to these claims of ineffective assistance that were raised in the new trial motion to the extent that they are supported by substantial evidence. (*Taylor*, *supra*, 162 Cal.Ap.3d at pp. 724-725.) However, the trial court here made few factual findings as there was no separate evidentiary hearing—the trial court merely credited trial counsel's explanations for failing to present a mental health defense and for failing to present good character evidence, deeming counsel's omissions to be tactical and reasonable. Thus, we essentially apply a de novo standard of review to these claims of ineffective assistance, as we must review de novo the ultimate question of whether the facts as determined by the trial court (in this case, trial counsel's written explanations for his omissions) demonstrate a violation of Moustafa's right to effective counsel. (*Ibid.*)

[13] Moustafa's trial counsel was in possession of this e-mail, in a folder labeled with predecessor counsel's name.

47

[S.D.]."  The trial court denied the new trial motion again after considering the additional arguments.

### 3. *Failure to Investigate Mental Health Defenses*

First, we address Moustafa's claim that his trial counsel rendered ineffective assistance by failing to investigate his mental health, which precluded him from pursuing a defense based on diminished actuality and pursuing a defense of legal insanity.  We conclude that trial counsel's failure to investigate Moustafa's mental health constituted deficient performance but that Moustafa has failed to demonstrate prejudice from trial counsel's omissions.

### a. *Deficient Performance*

Moustafa argues that his trial counsel rendered ineffective assistance because counsel should have reasonably known that he had mental health issues yet failed to investigate possible defenses.

In part, Moustafa points out that shortly after he was incarcerated for his offenses in 2013, he was diagnosed with depression and prescribed medication for "psychotic symptoms."  Here, trial counsel did not sign the more specifically worded declaration prepared by Moustafa's new counsel that averred that trial counsel "did not obtain [Moustafa's] medical and mental health records before trial" and that he did not "investigate a mental health defense based upon diminished intent or insanity."  Trial counsel, however, responded to new counsel's declaration by clarifying only that he did in fact obtain Moustafa's *medical* records—neither specifically addressing nor denying new counsel's assertion that he failed to obtain Moustafa's *mental health* records.  Presumably, had trial counsel acquired Moustafa's mental health records, trial counsel would have said so in his letter.  (See, e.g., *People v. Riel* (2000) 22 Cal.4th 1153, 1189 [if a person makes a statement in the presence of a party that would normally call for a response if the statement were untrue, party's silence, evasion, or equivocation may be

48

considered as a tacit admission].)  The record therefore reflects that trial counsel failed to obtain Moustafa's mental health records.

Under the circumstances, there can be no rational, tactical basis for trial counsel's omissions.  Trial counsel generally stated in his letter that he did not investigate a mental health defense because he did not believe "that Mr. Moustafa had either a diminished intent, was legally unconscious or was insane."  Although at the outset trial counsel sought a psychological evaluation from Dr. Williams, that evaluation was limited to Moustafa's risk of reoffending.  Williams ultimately opined that he had no basis to diagnose Moustafa with any mental health condition, but this opinion was based on a clinical interview without any of Moustafa's mental health records, the existence of which counsel was on notice of.

In this case, trial counsel was aware—or at least on notice—that Moustafa had a history of mental illness requiring successive hospitalizations, yet trial counsel did not investigate that history or evaluate whether it might supply viable defenses or mitigation.  The limited purpose and inadequately informed scope of Williams's assessment does not remedy this deficiency.  Moustafa's trial counsel was in possession of correspondence from Moustafa's father dated three years before Williams conducted his evaluation, in which Moustafa's father raised the issue of Moustafa's "psychological problems" and reported that (1) the father had "all the documents" regarding Moustafa's psychiatric hospitalization in France and (2) Lauren had knowledge of two subsequent psychiatric hospitalizations in the United States.  The correspondence included a handwritten note on the letterhead of a Paris-based doctor referencing Moustafa's "serious psychological disorders requiring numerous hospitalizations and consultations for anxiety[,] psychosis[,] and attempted suicide."  And as Moustafa points out, he was diagnosed with depression and prescribed medication for "psychotic symptoms" shortly after his arrest.

At the hearing on Moustafa's motion for a new trial, the trial court concluded that Moustafa's trial counsel may have had a valid tactical reason for choosing to dispute only

49

whether Moustafa committed the criminal acts and not whether he had criminal intent. The trial court reasoned that a mental health defense might have "diluted" Moustafa's defense at trial that he did not inflict the injuries on S.D. We agree that adequately informed trial counsel may develop valid tactical reasons to not *present* mental defenses at trial, as such defenses may indeed undercut an alternative defense that Moustafa did not commit the acts at all. But it is not the objective or relative merit of the trial defenses that were actually presented or rejected that we evaluate here, but trial counsel's antecedent failure to ensure that the choice of trial defense would be informed by an adequate investigation of Moustafa's mental health history in the first place. "Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts." (*People v. Ledesma* (1987) 43 Cal.3d 171, 222.) Thus, " '[c]riminal defense attorneys have a " 'duty to investigate carefully all defenses of fact and of law that may be available to the defendant . . . .' " ' " (*Ibid.*) Doing so permits trial counsel to "make an informed recommendation to his client." (*Ibid.*)

We appreciate that trial counsel undertook an evaluation, albeit for a limited purpose, and we do not suggest that counsel lacked the discretion to make *informed* decisions about what evaluations to commission. But without knowing the basis for Moustafa's prior psychiatric hospitalizations, trial counsel's reliance here on his own lay opinion that Moustafa was not mentally ill was not informed decisionmaking: it was objectively unreasonable on these facts. The failure to investigate mental health defenses "deprived [trial counsel] of the reasonable bases upon which to reach *informed* tactical and strategic trial decisions." (*People v. Frierson* (1979) 25 Cal.3d 142, 163; *People v. Mozingo* (1983) 34 Cal.3d 926, 934 (*Mozingo*).) Williams's assessment of Moustafa—given its focus on future dangerousness—did little to inform counsel about available defenses to allegations of past criminal conduct. To the limited extent that the Williams evaluation hazarded a diagnosis, counsel's withholding from the expert known, accessible, relevant information about Moustafa's past psychiatric treatment prevents us

from treating counsel's decision to commission the evaluation as a substitute for actually obtaining those records and properly interpreting them. Nor does Moustafa's own participation in the evaluation cure the deficiency in counsel's performance: in view of Moustafa's documented delusions, paranoia, and grandiosity, we are unable to sanction trial counsel's reliance on him to inform Williams of his relevant history. (See *Mozingo*, *supra*, at p. 933 [noting referee's conclusion that " 'by its inherent nature, a mental defense is often beyond the client's understanding' "].)

Accordingly, we conclude that in this case, trial counsel's failure to investigate Moustafa's possible mental health defenses was not a reasonable tactical decision and fell below an objective standard of reasonableness. (*Strickland*, *supra*, 466 U.S. at p. 687.)

### b. *Prejudice*

Next, Moustafa argues that trial counsel's failure to investigate was prejudicial because it precluded him from pursuing various defenses related to his mental health: defense of others or legal necessity, diminished actuality, or a plea of not guilty by reason of insanity. Primarily, Moustafa relies on the psychological report prepared by Coles, reflecting a diagnosis of bipolar disorder, and argues that the introduction of such evidence would have resulted in a more favorable verdict. (See *Strickland*, *supra*, 466 U.S. at p. 694.) Notwithstanding our concerns regarding trial counsel's failure of investigation, we conclude that Moustafa is unable to demonstrate on this record that he was prejudiced by trial counsel's omissions.

### i. *Defense of Others or Legal Necessity*

First, we reject Moustafa's claim that his mental health diagnosis would on this record have made viable the theories of self-defense, defense of another (CALCRIM No. 3470), or legal necessity (CALCRIM No. 3403). Assuming without deciding that

such defenses would apply,[14] a requirement for self-defense of others is that a person must believe that a third party was in "imminent harm"—" '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) " ' " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*People. v. Trujeque* (2015) 61 Cal.4th 227, 270 (*Trujeque*).) Similarly, the defense of legal necessity requires that the defendant prove that there was " 'an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent.' " (*Id.* at p. 273.) Coles's report itself focused on the precipitating subjective motivation or justification for Moustafa's acts—that he was protecting his girlfriend from a recurrence of sexual assault. For example, Coles generally opined that "[Moustafa] became solely focused on preventing [A.D.] from being raped and, in his mind, anything he did to prevent this was justified." But Coles in his report stopped short of opining that Moustafa's paranoid delusions influenced his perception of the imminence of threatened harm to A.D. (See *People v. Medina* (1995) 11 Cal.4th 694, 773 [on direct appeal, "a claim of ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses"]; cf. *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 747; see *id.* at pp. 756-757 [prejudicial to exclude expert opinion that homeless individual who has been repeatedly subject to violence and the threat of

_____

[14] We observe that in *People v. Elmore* (2014) 59 Cal.4th 121, the California Supreme Court concluded that the doctrine of unreasonable self-defense is unavailable when the need to defend oneself is purely delusional. (*Id.* at p. 130.) "A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity." (*Ibid.*) We discuss Moustafa's claim regarding trial counsel's failure to pursue a plea of not guilty by reason of insanity *post*, part II.3.b.iii.

violence "will experience a heightened sensitivity to such threats and will have a reduced threshold at which he or she subjectively perceives an imminent threat"].)

Crediting Coles's opinion, Moustafa's paranoid belief that his actions were justified or that he needed to prevent A.D. from future sexual assaults does not avail him of either of these defenses—there is no evidence that Moustafa believed A.D. was in *imminent* harm or that his actions were solely in response to emergency situations that necessitated instantaneous responses. (See *Trujeque*, *supra*, 61 Cal.4th at p. 270.) The evidence at trial was that Moustafa escalated his abuse of S.D. only *after* he believed he caught S.D. in the act of sexually assaulting A.D. Although it is true that Moustafa made statements to the police that indicated he believed that S.D. was continuing to sexually assault A.D. and that A.D. was at a risk of harming herself, Moustafa's statements did not describe emergency situations.[15] A.D. was not even at home during some of the attacks described by S.D. At best, Moustafa's statements to the police reflected his belief that A.D. might incur harm in the near future, which is not imminent harm. (*Ibid.*) Accordingly, Moustafa has not met his burden to demonstrate that he would have received a more favorable verdict absent his counsel's failure to pursue these defenses. (*Strickland*, *supra*, 466 U.S. at p. 694.)

---

[15] For example, Moustafa told Motomura that S.D. had confessed many times to touching A.D. Moustafa also vaguely said that sometimes he would "suddenly catch [S.D.] by the things opening the—and it was just one time after another after another and another." Motomura also specifically asked Moustafa if he had hit S.D. to "prevent him from doing something to his sister," but Moustafa stated only that he was afraid A.D. could "kill herself and [he] just can't live with that." Moustafa later said that he had caught S.D. using A.D.'s clothes to masturbate, which caused him to fear "los[ing][his] little girl," which in turn prompted him to punch S.D. hard between the legs. These prior statements do not establish the existence of an imminent threat.

53

## ii. *Diminished Actuality*

We also find no merit in Moustafa's claim that evidence of his mental health diagnosis would have diminished his specific intent with respect to his convictions for torture, sexual penetration, criminal threats, and human trafficking, as well as the torture enhancement alleged under the One Strike law.

To support a defense of "diminished actuality," a defendant presents evidence of voluntary intoxication or mental condition to show he "actually" lacked the mental states required for the crime. (*People v. Steele* (2002) 27 Cal.4th 1230, 1253 (*Steele*).) Under section 28, subdivision (a), "[e]vidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to . . . intent . . . . Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." "[T]he failure to discover or present [evidence of diminished actuality] will be considered prejudicial only if it might have caused a reasonable jury to conclude that the defendant actually lacked the mental capacity that constituted an element of the charged offense." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

First, Moustafa was convicted of torture (§ 206) which requires "the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Massie* (2006) 142 Cal.App.4th 365, 370-371 (*Massie*).) The enhancement alleged under the One Strike law for a sex offense committed with torture (§ 667.61, subd. (d)(3)) requires the same specific intent. Generally, " '[c]ourts have interpreted intent to inflict "cruel" pain and suffering as an intent to inflict extreme or severe pain.' " (*People v. Odom* (2016) 244 Cal.App.4th 237, 246.) For example, the existence of anger does not negate the specific intent to cause

54

cruel or extreme pain that is required for a conviction of torture. (*Massie*, *supra*, 142 Cal.App.4th 365, 372.)

Here, Coles opined that Moustafa's bipolar disorder may have played a part in his offenses because he believed that his actions were justified, and he was committed to protect A.D. from being sexually assaulted. And in his supplemental letter, Coles opined that a person with a condition like Moustafa's would be "making decisions based upon a faulty apprehension of reality," and that his actions would be "dominated by unrealistic . . . delusional concerns and one weighs the consequences of one's actions, if at all, i[n] light of these same concerns." However, Moustafa's belief that his actions were justified or his failure to appropriately weigh the consequences of his actions does not negate an intent to cause cruel or extreme pain. And nothing in Coles's opinion suggested that Moustafa's mental disorder prevented him from forming the intent to cause S.D. pain. Moreover, the fact that Moustafa believed that his actions were a necessary response to S.D.'s alleged sexual assaults against his sister would have supplied a basis for the trial court to conclude that Moustafa committed the acts either as revenge or as a form of persuasion to prevent S.D. from committing further, similar assaults. Such an intent would satisfy the specific intent for torture under section 206. (See *Massie*, *supra*, 142 Cal.App.4th at pp. 370-371.)

Second, Moustafa was convicted of forcible sexual penetration, which requires that a penetration be committed "for the purpose of sexual arousal, gratification, or abuse by any foreign object." (§ 289, subd. (k)(1).) Thus, "the crime of unlawful sexual penetration requires the specific intent to gain sexual arousal or gratification *or* to inflict abuse on the victim." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538 (*McCoy*), italics added.) The intent to inflict abuse has no sexual component and means " 'to injure or hurt badly, not lewdness.' " (*Id.* at p. 1541.)

Here, although Coles opined that Moustafa's acts were not sexually motivated, there is no requirement that Moustafa commit sexual penetration solely for the purpose of

55

sexual gratification—all that is required for a conviction for sexual penetration is the intent to inflict abuse. (See *McCoy*, *supra*, 215 Cal.App.4th at p. 1541.) In fact, the prosecutor's theory of the case was never that Moustafa had the intent to gain sexual arousal or gratification from his acts—only that Moustafa accomplished his act with duress, force, and violence. Moreover, as with Moustafa's torture conviction, the fact that Moustafa believed his actions were justified or that the planning of his actions was "outweighed" by his delusional concerns was not evidence that he lacked an intent to inflict abuse or injury on S.D. Rather, Moustafa's mental disorder provided him a *motive* to commit the abuse.

Third, Moustafa was convicted of criminal threats (§ 422) against both S.D. and A.D., which requires that a person "willfully threaten[s] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . be taken as a threat, even if there is no intent of actually carrying it out." (*Ibid.*) Moustafa, however, presents no evidence that his mental disorder prevented him from intentionally making a threat. (See *People v. O'Hearn* (2020) 57 Cal.App.5th 280, 298 [psychosis disorder could have been used to persuade a jury that a defendant lacked the "intentionality necessary" for a violation of section 422].) In fact, Moustafa's paranoid belief that A.D. was in danger and S.D. was harming her supplied him with a reason to make a real threat toward S.D. And even if Moustafa believed that he needed to protect A.D. and that his threats against her were somehow for her greater good, his bipolar disorder does not negate his intent that his threats be taken seriously.

And finally, Moustafa was convicted of human trafficking (§ 236.1, subd. (a)), which requires that a defendant act with the specific intent "to obtain forced labor or services." (*Ibid.*) Even if we assume, as Moustafa argues, that Moustafa possessed a delusional belief that S.D. owed him some sort of debt or he was sent by God to protect A.D. and S.D., this belief would not have negated his intent to obtain forced labor from S.D. as a means to repay that imagined debt. In fact, such a delusion explained *why*

Moustafa would force S.D. to work. Nor would the existence of a *real* debt have negated Moustafa's specific intent to commit human trafficking. Moreover, though there is evidence that Moustafa believed S.D. owed him money, this evidence does not show that Moustafa believed that S.D. *consented* to forced labor as a means of repayment.

We note that in his supplemental letter, Coles also offered that "it is most often the case that mania or any severe emotional state compromises one's ability to think rationally." Yet this generalized assertion would not reasonably suggest to a factfinder that Moustafa actually lacked the requisite mental states—i.e., that he did not intend to cause S.D. pain, or that he did not intend to inflict injury or abuse. (See *Steele*, *supra*, 27 Cal.4th at p. 1253.) In context, Coles's opinion here goes more toward Moustafa's decisionmaking process and his ability to be deterred by the consequences of his crimes, and whether he was able to think "rationally" about these consequences before acting. That Moustafa may have been overly influenced by his delusional belief that S.D. was abusing A.D. did not demonstrate his lack of specific intent.

Moustafa, however, argues that a diminished actuality defense can be established by "testimony describing how mental illness *generally affects* a person's intent and that it *could have affected* the defendant's required intent at the time of the offense." To support his claim, Moustafa cites to *People v. Reyes* (1997) 52 Cal.App.4th 975 (*Reyes*), *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*) and *People v. Herrera* (2016) 247 Cal.App.4th 467 (*Herrera*). In these three cases, the Courts of Appeal determined that the respective trial courts prejudicially erred by excluding individualized expert testimony as to the defendants' respective mental health that could have negated a necessary specific intent or knowledge. (*Reyes*, *supra*, 52 Cal.App.4th at p. 986; *Cortes*, *supra*, 192 Cal.App.4th at p. 912; *Herrera*, *supra*, 247 Cal.App.4th at p. 478.)

We agree that evidence of mental illness may be relevant and admissible in countering an allegation of specific criminal intent, but it is not the general admissibility of such evidence that is at issue—at issue is the impact of such evidence on a factfinder

and whether it is reasonably probable that such evidence would have resulted in a more favorable outcome for Mosutafa.  (*Strickland*, *supra*, 466 U.S. at p. 694.)  To that end, *Reyes*, *Cortes*, and *Herrera* are distinguishable because in each of these cases, the nexus between the defendants' respective mental disorders and the specific intent the disorder might negate was clear.

In *Reyes*, the defendant's mental health was relevant to whether he knew the items he had were stolen.  The *Reyes* defendant testified that he used controlled substances and that he did not recall when he obtained the stolen items as he had " 'trouble when [he] use[d] a lot of drugs remembering things of that nature' " and that when he was on drugs, he had a " 'compulsion, you know, just to pick, . . . on trash cans.' "  (*Reyes*, *supra*, 52 Cal.App.4th at pp. 980-981.)[16]  The excluded expert testimony was that the defendant's mental health issues could have rendered it "possible for such a person to lack knowledge of his acts."  (*Reyes*, *supra*, at p. 981.)

In *Cortes*, the trial court precluded the expert from testifying that the defendant, who was charged with premeditated and deliberated murder, was in a dissociative state or even that he exhibited behavior from which a trier of fact could infer that he was in a dissociative state.  (*Cortes*, *supra*, 192 Cal.App.4th at pp. 899-900.)  At trial, the defendant had testified about his prior experiences, including an altercation the defendant

---

[16] It also appears that in *Reyes*, the Court of Appeal may have applied the more stringent standard of prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (holding that federal constitutional error warrants reversal unless shown to be harmless beyond a reasonable doubt).  " 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' "  (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)  However, "completely excluding evidence of an accused's defense theoretically could rise" to the level of infringing upon a defendant's right to present a defense—and in that case, *Chapman* applies.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)  And in *Reyes*, the Court of Appeal held that the "total preclusion of evidence" unfairly denied the defendant of an opportunity to prove he lacked the requisite knowledge.  (*Reyes*, *supra*, 52 Cal.App.4th at p. 986.)

had at age 12 or 13 with his mother's then-boyfriend, which generated a "trapped feeling"—the same feeling the defendant felt when he committed the subsequent murder. (*Cortes*, *supra*, 192 Cal.App.4th 873, 886.)  It is axiomatic that a defendant in a dissociative state is not conscious of acting and therefore cannot deliberate or premeditate.

And likewise, in *Herrera*, an expert was permitted to testify only about the generic definition of trauma and PTSD but was precluded from testifying about the defendant's psychiatric impairments at the time he allegedly committed premeditated and deliberated murder.  (*Herrera*, *supra*, 247 Cal.App.4th at pp. 474-475.)  At trial, there was evidence that the defendant had experienced PTSD and had been sexually molested and abused in the past; the defendant later testified that the victim had grabbed a knife and lunged at him first, and that the defendant accordingly thought the victim was going to kill him, which sent the defendant into a " 'rage.' " (*Herrera*, *supra*, 247 Cal.App.4th at pp. 471-474.)  Thus, in *Herrera*, the excluded evidence could have supported the defendant's theory "that he attacked his friend while under a dissociative, PTSD-induced fog."  (*Id.* at p. 479.)

Here, Coles supplied both a report and a supplemental letter evaluating Moustafa, but his expert opinion can be distilled to generic assertions that Moustafa's course of conduct was set off by his "delusional paranoia" and that his bipolar disorder "clearly affected his thinking and psychological state and intent at the time he committed the controlling offenses."  And as we described, *ante*, these opinions do not suggest that, at the time of his offenses, Moustafa *actually lacked* the scienter required for the crimes of which he was convicted.  (*Steele*, *supra*, 27 Cal.4th at p. 1253.)

Although section 29 precludes an expert from testifying "as to whether the defendant had or did not have the required mental states," what forecloses a finding of prejudice on the appellate record here is evidence from which the trier of fact could reasonably infer not merely that Moustafa suffered from delusions and paranoia in the

prolonged time frame over which he abused S.D. and A.D., but that his delusions and paranoia negated the specific intent "to cause cruel or extreme pain . . . for persuasion" (§ 206), "to inflict" abuse (§ 289), to have his "statement[s] . . . be taken as a threat" (§ 422), or "to obtain forced labor or services" (§ 236.1). Taken as a whole, the evidence at trial and in the new trial motion does not reasonably suggest that Moustafa *actually lacked* the requisite mental states at the time he committed the offenses. Far from suggesting that he was experiencing relevant delusions or paranoia or exhibiting symptoms of such disorders at or near the time of criminal acts charged, Moustafa continued, according to Coles, to "den[y] a good deal of the violent behavior he was convicted of." This stands in contrast with *Reyes*, *Herrera*, and *Cortes*.

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." (*Harrington v. Richter* (2011) 562 U.S. 86, 111.) "The likelihood of a different result must be substantial, not just conceivable." (*Id.* at p. 112.) We agree that it is *possible* that counsel's failure to investigate impacted the outcome of Moustafa's case. We are unable to conclude on this appellate record, however, that it is reasonably likely that the result would have been different absent counsel's failure to investigate. (*Ibid.*; *Strickland*, *supra*, 466 U.S. at p. 694.)

### iii. Plea of Not Guilty by Reason of Insanity

Next, Moustafa argues that trial counsel was ineffective for failing to adequately investigate and pursue a defense that he was not guilty by reason of insanity. We conclude that even though trial counsel was ineffective, Moustafa has not demonstrated that counsel's omissions were prejudicial.

To prevail on a defense of insanity, Moustafa would have to show by a preponderance of the evidence that at the time the offense was committed, he was

incapable of knowing or understanding the nature of his act or of distinguishing right from wrong. (*People v. Lawley* (2002) 27 Cal.4th 102, 169-170; § 25, subd. (b).) Here, Coles's opinion was that Moustafa believed that his actions were justified, that he was saving A.D. from a renewed sexual assault, and that he may not have rationally weighed the consequences of his actions. Coles, however, gave no opinion on whether Moustafa's mental disorder prohibited him from being able to distinguish right from wrong or from being able to understand the nature of his actions.

For example, there was evidence that though Moustafa may have believed he was acting for A.D.'s benefit, he nevertheless understood the wrongfulness of his specific conduct. A.D. testified that Moustafa coached her on what to say to the police— including that Moustafa was a "good guy" that had "nothing to do with anything with the beatings." A.D. also testified that Moustafa expressed concern that the police would see injuries on S.D., suggesting that he knew that the "beatings" he had administered were in fact wrong and that he wished to evade criminal prosecution for his actions. During the pretext phone call between S.D. and Moustafa, Moustafa repeatedly asked S.D. if S.D. believed that Moustafa beat him, and if S.D. did, Moustafa would "want to go to court" because if he in fact "did something wrong" he would "need to face justice." Moustafa's comments suggest that he knew that beating S.D. in any capacity could be considered criminal. Likewise, during his interview with Detective Motomura, Moustafa admitted that he "hit [S.D.] really hard" several times, in part because he found S.D. masturbating to a piece of A.D.'s clothes. Moustafa, however, denied any wrongful conduct and asserted that he did not "abuse" S.D. or "hurt him every day." Moustafa's attempt at minimizing his conduct to Motomura again suggests that he knew that physical abuse was impermissible.

On this record, Moustafa therefore fails to meet his burden to demonstrate that had evidence of his bipolar disorder been admitted, it is reasonably probable that he would

61

have been able to successfully pursue an insanity defense. (*Strickland*, *supra*, 466 U.S. at p. 694.)

*People v. Leeds* (2015) 240 Cal.App.4th 822, upon which Moustafa relies, is distinguishable. In *Leeds*, the Second Appellate District noted in the context of self-defense that "[a] person suffering from a delusion that causes him to fear that another is attempting to take his life is legally insane if the facts perceived as the product of his delusion would legally justify his acting in self-defense." (*Id.* at p. 829.) Thus, if a defendant, as a consequence of his or her delusion, believes that there is imminent peril, then he or she would be exempt from punishment for acting in self-defense. (*Ibid.*) *Leeds* is inapplicable. As we noted, *ante*, Moustafa's paranoid beliefs about S.D.'s alleged sexual assault of his sister A.D. would not have given rise to a defense of either defense of others or necessity, as there was no evidence in the trial record or even his extrajudicial statements in Coles's report to suggest that he committed the criminal acts in fear of imminent harm. Unlike *Leeds*, Moustafa's paranoid delusions did not legally justify his actions under a theory of self-defense. (*Id.* at p. 828 [" '[p]ersons who are paranoid and believe that the victim is going to get them some time in the future, so they hunt the victim first, are not' insane"]; see also *Humphrey*, *supra*, 13 Cal.4th at p. 1082 [" '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice ' " for claim of self-defense].)[17]

---

[17] Furthermore, "a criminal defendant must enter a plea of not guilty by reason of insanity personally and in open court." (*People v. Weaver* (2001) 26 Cal.4th 876, 963; §§ 1018, 1016.) Here, there is nothing in the appellate record to suggest that Moustafa would have been amenable to such a plea. In fact, the record reflects that Moustafa maintained his factual innocence. Although Moustafa agreed to participate in Coles's evaluation, Moustafa indicated when asked that "he never physically abused or otherwise tortured [S.D.]," and he "was extremely reticent to acknowledge suffering with psychological problems and clearly does not believe that he is delusional." Moustafa relies on *Mozingo*, *supra*, 34 Cal.3d 926, for the proposition that on appeal he need not establish any reasonable likelihood that he would have been open to an insanity or intent-

### 4. *Failure to Investigate and Present* **Stoll** *Evidence*

Next, Moustafa argues that trial counsel rendered ineffective assistance when he failed to investigate or present evidence of his character for nonsexual deviancy, otherwise known as *Stoll* evidence. We conclude that Moustafa does not meet his burden to demonstrate that his trial counsel's performance was deficient.

Generally, psychological opinions " 'may be admitted as character evidence tending to show that an individual was or was not likely to have committed a particular act.' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 567; *People v. Stoll* (1989) 49 Cal.3d 1136, 1153 (*Stoll*); Evid. Code, § 1102, subd. (a).) Thus, in *Stoll*, *supra*, 49 Cal.3d 1136, the California Supreme Court concluded that the trial court erred when it excluded expert opinion testimony that the defendant had " 'a *normal personality function*' " and had not previously engaged in "*sexual deviancy* of any kind." (*Id.* at p. 1149.)

Moustafa argues that *Stoll* evidence could have raised a reasonable doubt that he committed the acts of sexual penetration, as Coles opined that Moustafa was not predisposed to commit acts of sexual deviancy. The record, however, does not reflect

---

based defense to demonstrate prejudice. *Mozingo*, however, was a capital habeas proceeding in which the high court reviewed a fully developed post-conviction record for substantial evidence in support of a referee's findings of ineffective assistance of counsel. (*Id.* at pp. 934-935.) It was in addressing *Strickland*'s first prong that the court—like the referee—rejected the prosecution's argument that the defendant's assertion of an alibi defense and general denial of guilt excused trial court's failure to investigate diminished capacity or insanity defenses or mental illness as mitigation. (*Mozingo*, *supra*, at pp. 933-934.) The high court did not discuss the referee's resolution of *Strickland*'s prejudice prong. And recent cases, including the United States Supreme Court's decision in *McCoy v. Louisiana* (2018) ___ U.S. ___ [138 S.Ct. 1500], have reaffirmed a defendant's right to determine the objectives of the defense—such as whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, forego an appeal, or to assert innocence. (*Id.* at p. __ [138 S.Ct. at p. 1508]; see also *United States v. Read* (9th Cir. 2019) 918 F.3d 712, 719 [applying *McCoy* to hold that counsel's presentation of an insanity defense over defendant's objection violates the Sixth Amendment].)

63

why trial counsel failed to investigate or present *Stoll* evidence.  Both the unsigned declaration that was prepared by Moustafa's new counsel and the signed letter by trial counsel are silent on the *Stoll* issue.[18]  The record thus does not affirmatively disclose that counsel had no rational tactical purpose for these omissions, or that trial counsel was asked for an explanation but failed to provide one.  (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

Even if we assume trial counsel's performance was deficient, however, Moustafa cannot demonstrate prejudice.  Coles opined that Moustafa's actions were not sexually motivated and that Moustafa had no sexual deviancy or abnormality.  Although Coles's expert opinion may have been relevant to whether Moustafa committed the sexual penetration with the specific intent to obtain sexual gratification or arousal, Coles's opinion has no bearing on whether Moustafa's acts were committed with the intent to inflict *abuse* on S.D.—which does not require any lewd intent on Moustafa's part.  (See *McCoy*, *supra*, 215 Cal.App.4th at p. 1541 [intent to inflict abuse for violation of section 289 does not require lewdness].)

Likewise, we find no merit in Moustafa's claim that Coles's opinion would have raised a reasonable doubt as to the torture charge under section 206.  Moustafa argues that Coles's report would have demonstrated that he is not a sadist, which is relevant to torture because the crime requires a specific "intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.)  Coles's opinion may have been relevant to whether Moustafa committed the torture for a "sadistic purpose," but it in no way negated or called into question whether Moustafa committed the torture for purposes of revenge, extortion, or deterrence.

---

[18] In his opening brief, Moustafa argues that his trial counsel "stated that he strategically decided to forego good sexual character testimony."  Moustafa's counsel, however, generally averred in his signed letter that he chose not to introduce "character evidence" and did not specifically reference evidence of Moustafa's character for non-sexual deviancy.

Accordingly, even if this type of evidence had been admitted, Moustafa has not demonstrated that he would have received a more favorable outcome. (*Strickland*, *supra*, 466 U.S. at p. 694.)[19]

### 5. *Failure to Present Evidence of Nonviolent Character*

Moustafa next argues that trial counsel was ineffective because he failed to investigate and present evidence of Moustafa's good character for nonviolence. Citing the transcript of Lauren's interview with the police where she averred that Moustafa had never been violent with her, as well as several declarations prepared by Moustafa's friends and family, Moustafa argues that multiple witnesses could have testified about his good character. We determine that Moustafa does not meet his burden to demonstrate counsel's performance was deficient.

As stated in trial counsel's signed letter, counsel was concerned that introducing character evidence could open the door to the admission of evidence regarding dishonesty or other damaging evidence. (See Evid. Code, § 1101, subd. (b).) For example, although Lauren told the police that Moustafa had never directed his anger toward her, she conceded that she saw him get into arguments with A.D. and S.D. Lauren also said that Moustafa always had a temper and she frequently argued with him.

Although trial counsel's explanation leaves unclear whether such rebuttal evidence existed, trial counsel may have reasonably decided that pursuing testimony from Moustafa's close family members may not have been particularly persuasive, as a

---

[19] For the first time in his petition for rehearing, Moustafa argued that if Coles's report and supplemental letter offering his opinion about Moustafa's mental health were insufficient to establish prejudice under *Strickland*, the trial court should have ordered an evidentiary hearing. As his claim of ineffective assistance of counsel is substantively distinct from a claim that the trial court erred in denying his new trial motion without an evidentiary hearing, we conclude that he has forfeited his claim by failing to raise it in his opening brief. (See *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092 [arguments cannot be raised for the first time in a petition for rehearing], abrogated on another ground in *Martinez v. Combs* (2010) 49 Cal.4th 35, 62-66.)

reasonable trier of fact could have readily disregarded their testimony as biased. The declarations prepared by the family members in support of the new trial motion were also vague—Moustafa's friend, sisters, brother, and mother generally stated that they had never seen Moustafa threaten or harm A.D., and that they were of the opinion that he was not a violent person. Given the slim nature of the record, we are hard pressed to find that trial counsel had no possible tactical reason for failing to pursue the witnesses as it is not entirely clear what their testimony would have encompassed. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 [appellate court should not "brand a defense attorney incompetent unless it can be truly confident all the relevant facts have been developed"].)

Accordingly, we conclude that Moustafa has not met his burden to demonstrate that his trial counsel rendered ineffective assistance by failing to present evidence of his good character. (*Strickland*, *supra*, 466 U.S. at p. 687-688.)

### 6. *Failure to Seek Sanctions for the Return of the Victims' Cell Phones*

Finally, Moustafa argues that trial counsel was ineffective because he did not seek sanctions for law enforcement's failure to preserve or analyze data from A.D.'s and S.D.'s cell phones before returning the cell phones. We conclude that Moustafa cannot prevail on his claim because he does not demonstrate that counsel's performance was deficient, as trial counsel may have reasonably concluded that a motion for sanctions would have been denied. We also conclude that even if we assume counsel should have brought a motion for sanctions, Moustafa cannot demonstrate prejudice.

### i. *Deficient Performance*

At trial, the parties stipulated that, "[i]f called to testify, Mountain View Police Officer Fernando Maldonado would testify that he did obtain a search warrant for various items, specifically including cellphones for [A.D.] and [S.D.]. Those two cellphones . . . were returned to each respective party and there was no extraction or search done for those two cellphones." At trial, Motomura testified if the cell phones had been seized during the search the police continued to retain them but that he had never downloaded

66

the contents of either sibling's cell phones. The warrant obtained by Maldonado authorized the seizure of the cell phones of A.D., S.D., and Moustafa, not the download of data contained therein. Motomura sought a follow-up search warrant to download the contents of only Moustafa's phone: it was not his general practice to apply for a warrant to download the contents of a victim's cell phone. Motomura stated that he found S.D. credible during their interview and did not at that time believe he would find anything on S.D.'s phone that would not be on Moustafa's devices. Motomura acknowledged that information from cellphones "can be valuable for the prosecution just as it could be valuable for the defense."

Generally, "[d]ue process requires the state preserve evidence in its possession where it is reasonable to expect the evidence would play a significant role in the defense." (*People v. Alexander* (2010) 49 Cal.4th 846, 878.) The "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 489 (*Trombetta*).)

However, a different standard applies to evidence that *might* be exculpatory if subjected to further analysis or tests. This is because " '[w]henever *potentially* exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown, and, very often, disputed.' " (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58 (*Youngblood*).) In *Youngblood*, the United States Supreme Court hesitated to read the due process clause "as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (*Id.* at p. 58.) Therefore, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Ibid.*)

67

In other words, "there is a distinction between *Trombetta*'s 'exculpatory value that was apparent' criteria and the standard set forth in *Youngblood* for 'potentially useful' evidence." (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773 (*Alvarez*).) If the standard of apparently "exculpatory value" is met, due process has been violated if the evidence has not been preserved. (*Trombetta*, *supra*, 467 U.S. at p. 489.) On the other hand, if the evidence is merely "potentially useful," the defendant must also establish the police or prosecution acted in bad faith in failing to preserve the evidence. (*Youngblood*, *supra*, 488 U.S. at p. 58.)

" '[T]he presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' " (*People v. Montes* (2014) 58 Cal.4th 809, 838 (*Montes*), quoting *Youngblood*, *supra*, 488 U.S. at p. 58.) Thus, for example, if the police or prosecutor " 'by their conduct indicate that the evidence could form a basis for exonerating the defendant' [citation] and fail to preserve it, that shows bad faith." (*Alvarez*, *supra*, 229 Cal.App.4th at p. 777.)

Here, the exculpatory value of the victims' cell phones was not apparent, as it is unknown what the data from the phones might have disclosed. (See *Trombetta*, *supra*, 467 U.S. at p. 489.) Thus, to prevail on a motion for sanctions under *Trombetta*/*Youngblood*, Moustafa would have been required to demonstrate bad faith on the part of the police or prosecution. (See *Youngblood*, *supra*, 488 U.S. at p. 58.)

Moustafa argues that the apparent failure to adhere to section 1536, which requires that evidence seized by a warrant be retained "subject to the order of the court to which he is required to return the proceedings before him, or of any other court in which the offense in respect to which the property or things taken is triable[,]" categorically establishes bad faith. Moustafa, however, cites to no authority for this proposition.

In *People v. Flores* (2020) 9 Cal.5th 371 (*Flores*), the California Supreme Court examined whether a detective's failure to follow certain optional procedures to retrieve a

68

firearm as described in the Legal Assistance Treaty Between the United States and Mexico (treaty) demonstrated bad faith. (*Id.* at p. 395-396.) The defendant in *Flores* relied on several cases from other jurisdictions in arguing that a violation of formal procedures governing the preservation of evidence constitutes bad faith. (*Ibid.*) The *Flores* court, however, did not adopt the reasoning employed by the out-of-state cases— the California Supreme Court distinguished them by noting that compliance with the treaty was not mandatory; thus, the *Flores* defendant was unable to "identify any violation of 'clear and unambiguous' procedures." (*Flores*, *supra*, at p. 396.)

On appeal, Moustafa relies on the out-of-state cases distinguished in *Flores* and argues that unlike the treaty at issue in *Flores*, compliance with section 1536 is mandatory as it is state law. None of the cases cited by Moustafa, however, stand for the proposition that failure to adhere to mandatory policies or procedures, without more, compels a finding of bad faith. (See *United States v. Elliot* (E.D.Va. 1999) 83 F.Supp.2d 637, 647 [ "a showing that the Government failed to follow standard procedure [does not] *ipso facto* establish bad faith," though "the failure to follow established procedures is probative evidence"]; *United States v. Montgomery* (D.Kan. 2009) 676 F.Supp.2d 1218, 1243 [examining failure to adhere to policies, among other factors, as probative of bad faith]; *State v. Durnwald* (2005) 163 Ohio App.3d 361, 369, 837 N.E.2d 1234, 1241 [failure to adhere to certain policy was considered probative as to bad faith].)

Thus, under *Elliot*, *Montgomery*, and *Durnwald*, the failure to adhere to section 1536 in this case is just one factor to consider when assessing bad faith. And here, given Motomura's testimony that he (1) does not routinely seek to download victims' cell phone data, (2) believed that any relevant evidence from S.D.'s phone would have been found on Moustafa's devices, and (3) believed, at least until cross-examination, the police had retained the siblings' cell phones, trial counsel may have reasonably believed that making a *Trombetta*/*Youngblood* motion would have been futile. Failing to make a motion that counsel "reasonably determine[d] would be futile" is not

ineffective assistance.  (*People v. Price* (1991) 1 Cal.4th 324, 387, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.)

Arguing otherwise, Moustafa reasons that because cell phones hold a vast amount of data and information (see *Riley v. California* (2014) 573 U.S. 373, 393-397) and because Motomura generally testified that this vast amount of data "could be valuable" to the defense and prosecution alike, it must follow that the police knew the cell phone data had exculpatory value.  (See *Flores, supra*, 9 Cal.5th at p. 394, quoting *Trombetta, supra*, 467 U.S. at p. 488.)  We do not join Moustafa in equating a general awareness that cell phones might contain data useful to both parties with either knowledge that specific data have potential exculpatory value or an intention to deny a defendant the opportunity to assess its exculpatory potential.  Moustafa's argument is based solely on the probabilistic inference that the volume of unknown data on a cell phone may include some with theoretical utility to a defendant.  Although the inference has logical appeal, it falls short of *Youngblood*'s requirement that bad faith—to warrant the sanction of dismissal—"must necessarily turn on the police's knowledge of the exculpatory evidence at the time it was lost or destroyed."  (*Youngblood, supra*, 488 U.S. at pp. 56-57; *Montes, supra*, 58 Cal.4th at p. 838.)

For these reasons, *United States v. Zaragoza-Moreira* (9th Cir. 2015) 780 F.3d 971 and *People v. Fultz* (2021) 69 Cal.App.5th 395 (*Fultz*), upon which Moustafa relies, are readily distinguishable.  In *Zaragoza-Moreira*, it was established that a law enforcement agent was actually aware of the potentially exculpatory value of certain video evidence before the video was destroyed, as the defendant repeatedly told the agent that the video would have showed conduct that was supportive of her duress claim.  (*Zaragoza-Moreira, supra*, at p. 979.)  And in *Fultz*, the case against the defendant largely relied on the testimony of the accomplices; thus, any statements made by the accomplices were "highly relevant as impeachment evidence."  (*Fultz, supra*, at p. 428.)  Yet the government intentionally muted the audio while recording the accomplices'

interviews, which had been conducted "for the government's purpose of prosecuting defendant." (*Ibid.*) In this case, Moustafa points to no part of the record where it is affirmatively shown that officers were made aware that the victims' phones in fact contained potentially exculpatory evidence or that the phones were returned to deliberately avoid any discovery obligations.[20]

Accordingly, we conclude that Moustafa has failed to meet his burden on the first prong of the *Strickland* test. Under the circumstances presented here, a reasonably competent attorney may have determined that a motion for sanctions would not have been granted. (*People v. Price*, *supra*, 1 Cal.4th at p. 387; *Strickland*, *supra*, 466 U.S. at pp. 687-688.)

### ii. *Prejudice*

Moreover, even if we assume that failing to bring a *Trombetta/Youngblood* motion constituted deficient performance, we conclude that Moustafa fails to demonstrate he would have received a more favorable outcome.

Moustafa focuses on sanctions as a proper dismissal for the failure to preserve evidence, but trial courts " 'enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence," and not every failure to preserve evidence requires a dismissal of the charges. (*People v. Zamora* (1980) 28 Cal.3d 88, 99 (*Zamora*).) " 'The remedies to be applied need be only those required to assure the defendant a fair trial.' " (*Ibid.*) For example, the trial court could impose sanctions by "fashioning a suitable cautionary instruction" to the jury. (*People v. Medina* (1990) 51 Cal.3d 870, 894.)

---

[20] Moustafa argues that there was no evidence comparable to the data available on S.D.'s and A.D.'s cell phones available to the defense. It is unclear on this record what efforts counsel may have explored in the trial court to subpoena corresponding data from mobile service providers or internet service providers. We note that S.D.'s laptop was seized and subject to forensic analysis.

The appropriate sanction to impose depends on the circumstances of each individual case. "[L]awful and proper destruction requires no sanction [citations]; illegal and malicious suppression of evidence may result in dismissal [citations]." (*Zamora*, *supra*, 28 Cal.3d at p. 100.) Moreover, the type of sanction depends on the materiality of the evidence that was suppressed. "[B]ad faith destruction of evidence which might conclusively demonstrate innocence could require dismissal. [Citation.] Suppression of evidence which might impeach a witness for bias, however, may result in a new trial instead of a dismissal [citation]; suppression of evidence immaterial to the charge invokes no sanction [citation]." (*Ibid.*) A court must also consider "the impact of the sanction upon future cases and future police conduct. If a sanction is to deter suppression of records and evidence, it must contain a punitive element; it must outweigh the benefit that the prosecution gains from the suppression. At the same time the court must bear in mind the public interest in law enforcement, and the harm which may be inflicted by a sanction which prevents the trial and conviction of possibly guilty future defendants." (*Ibid.*)

In this case, dismissal of the underlying charges would have been an extreme sanction, relative to the indeterminacy of harm to Moustafa from the return of the victims' cell phones. There was nothing to suggest that the cell phones were returned to A.D. and S.D. in a malicious effort to conceal evidence; it is unclear whether the cell phones would have contained any exculpatory evidence in the first place. A more appropriate sanction may have been to include a cautionary instruction to the jury, but Moustafa's case proceeded by way of court trial. And the issue of the returned cell phones was already raised by trial counsel, who cross-examined Motomura on the subject at trial. We therefore fail to see how a *Trombetta/Youngblood* motion would have further assisted the defense.

72

Accordingly, we conclude that even if Moustafa had brought a motion for sanctions, it is not reasonably probable that he would have received a more favorable verdict. (*Strickland*, *supra*, 466 U.S. at p. 694.)

### 7. *Cumulative Ineffective Assistance*

Moustafa argues that even if his counsel's multiple deficiencies were not individually prejudicial, they were cumulatively prejudicial when considered together. (See *In re Gay* (1998) 19 Cal.4th 771, 826-830, overruled on a different point as stated in *People v. Mataele* (2022) 13 Cal.5th 372, 425.) We have found or assumed several instances of deficient performance stemming from counsel's failure to adequately investigate defenses related to Moustafa's mental health, failure to investigate and present *Stoll* evidence, and failure to move for sanctions under *Trombetta/Youngblood*. We conclude that even if we consider these deficiencies together, it is not reasonably probable that Moustafa would have received a more favorable outcome absent counsel's omissions. (*Strickland*, *supra*, 466 U.S. at p. 694.)[21]

### D. *Exclusion of Evidence of "Black Magic" Ritual Islamic Cleansing Practices*

Moustafa argues that he is entitled to a reversal of his convictions because the trial court erroneously excluded defense evidence linking S.D. to "black magic" ritual Islamic practices, which he maintains deprived him of his ability to present a defense. He also argues that the trial court erroneously excluded evidence that S.D. once said that he believed he deserved the beatings that were inflicted upon him. We conclude that there was no evidentiary error.

---

[21] We note that Moustafa argues only that he was prejudiced at trial by his trial counsel's omissions and requests that we reverse his convictions. Moustafa, however, does not argue that he could have received a more favorable result from a negotiated disposition in the absence of trial counsel's alleged omissions. We observe that to the extent that claims of ineffective assistance may turn on evidence not in the record on appeal, such claims are more appropriately litigated in a habeas corpus proceeding. (*People v. Mendoza Tello*, *supra*, 15 Cal.4th 264, 266.)

### 1. *Exclusion of Perlmutter's Testimony*

#### a. *Background*

Before trial, the defense sought to introduce the testimony of Dr. Dawn Perlmutter as an expert witness. The prosecutor moved to exclude Perlmutter's testimony on the grounds that it lacked foundation and had no probative value. The prosecutor argued that the defense had represented that Perlmutter's testimony was relevant to a theory of third-party culpability—that S.D.'s father had perpetrated the crimes in accordance with "honor violence and Muslim exorcism rituals."

At a hearing before the trial court, Moustafa's trial counsel explained that Perlmutter was "a critical witness for the defense . . . because she's an expert on ritual practices of various religions" and was familiar with Islam and "the whole concept of honor violence." Trial counsel claimed that Perlmutter's testimony was relevant because S.D. had made a prior statement to Motomura about how he had once spent a night with some sheikhs at a mosque in San Luis Obispo and had done "some black magic shit." S.D. had also told Motomura that the sheikhs "had this thing that is made up" called "Ithicoff."

Trial counsel proffered that according to Perlmutter, "Ithicoff" is "an Islamic ritual practice usually performed during the last days of Ramadan," and S.D.'s reference to "black magic shit" was consistent with "Ruqyah," a type of exorcism ritual intended to remove black magic. Trial counsel argued that Perlmutter believed that S.D. experienced great shame because of his frequent masturbation and that S.D.'s description of "black magic shit" was consistent with his going through an exorcism that could have turned violent and caused injuries similar to the ones he later sustained.

Trial counsel also argued that Perlmutter's testimony was relevant because A.D. had said in prior statements that in Pakistani culture, women are killed because they have either been raped or lost their virginity. According to Perlmutter, A.D. was "describing a textbook example of fears and abuse associated with family honor violence."

74

And finally, with regards to third-party culpability, trial counsel argued that Perlmutter's testimony was relevant because there was evidence that S.D. had previously complained that his father was "abusive."

In response, the prosecutor argued that Perlmutter's proposed testimony was "amorphous," in part because S.D.'s visit to the mosque took place well before the charged offenses were committed.[22]

After considering the parties' arguments, the trial court found that at least a portion of Perlmutter's proposed testimony was not sufficiently relevant to be admitted. In particular, the trial court expressed concerns over Perlmutter's proposed testimony about Islamic rituals, which it characterized as speculative. The trial court, however, stated that it was inclined to permit Perlmutter to testify as an expert in "a general area of culture that played a part in this offense."[23]

### b.     *Legal Principles*

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) However, a trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352.) Third-party culpability evidence is treated just like any other evidence, and is admissible if relevant, unless its probative value is substantially outweighed by the risk of undue prejudice under Evidence Code section 352. (*People v. Lewis* (2001) 26 Cal.4th 334, 372 (*Lewis*).) We do not disturb a trial court's discretionary ruling under Evidence Code section 352 unless it has abused its discretion. (*Lewis*, *supra*, at pp. 372-373.)

---

[22] At trial, S.D. testified that he visited the mosque in 2009.

[23] Despite the trial court's ruling, Moustafa did not call Perlmutter to testify as a witness on behalf of his defense.

75

### c.  *Analysis*

Below, Moustafa sought to introduce Perlmutter's testimony as part of his defense to either explain how some of S.D.'s injuries could have been sustained as part of some "black magic" exorcism ritual or as third-party culpability evidence to raise a reasonable doubt that S.D.'s father was responsible for S.D.'s injuries.  We find no abuse of discretion in the trial court's exclusion of Perlmutter's testimony.

Although Moustafa claimed that Perlmutter's testimony would be relevant to explain S.D.'s injuries, there is no evidence or suggestion *other* than S.D.'s reference to visiting a mosque in 2009 that S.D. was involved in any "black magic" or exorcism rituals.  However, the visit to the mosque took place three years before S.D. moved to Mountain View with A.D. and Moustafa.  S.D. was called as a defense witness, and even then, trial counsel did not ask him about his familiarity with rituals.  In fact, the prosecutor asked S.D. if he was "a modern Muslim in that you didn't practice perhaps or were not familiar with ancient rituals from centuries past," and S.D. agreed.  Moreover, S.D.'s statements to Motomura about his mosque only vaguely referenced "black magic" and did not specify that *he* had been the subject of an exorcism.  There was also no evidence to suggest that S.D.'s father was *physically* abusive toward him.[24]  Based on the record, the trial court reasonably found that Perlmutter's testimony was speculative and minimally relevant.  In other words, "[t]he trial court simply made a threshold evidentiary ruling to exclude speculative evidence, the probative value of which did not outweigh its prejudicial effect." (*Lewis*, *supra*, 26 Cal.4th at p. 373.)

Moustafa argues that S.D. wrote in his diaries that he focused on a specific Koran verse that said that those who "decide to change and believe, they will be cleansed of their difficulties and past sins," which is consistent with him undergoing cleansing rituals.

---

[24] To the contrary, S.D. testified that he never experienced physical discipline from his father or any other family member from masturbating inside the home.

He also argues that there were times that S.D. was away from Moustafa during which S.D.'s participation in "Ruqyah" rituals could have inflicted injuries upon S.D. These arguments, however, are again speculative, as there is nothing to tie S.D.'s reference to the passage in the Koran about cleansing sins to any purported "black magic," and likewise no evidence to suggest that any such cleansing rituals took place when S.D. was away from Moustafa.

Moustafa next suggests that the trial court's admission of expert testimony on intimate partner violence and Stockholm syndrome demonstrates that the trial court treated the prosecution favorably over the defense because the trial court excluded his proffered evidence of "black magic," which he characterizes as similar in nature. We are not persuaded that any favorable treatment is demonstrated on the record. Moustafa in this case sought to introduce evidence that was reasonably found to be more prejudicial than probative. In contrast, the prosecutor sought to introduce relevant expert evidence—expert testimony on intimate partner violence, which included a subset of traumatic bonding, Stockholm syndrome—to explain to the trier of fact why victims of abuse may not, for example, immediately report their abuse or leave their abuser. (See Evid. Code, § 1107 [expert testimony on intimate partner battering and its effects are admissible]; *People v. Brown* (2004) 33 Cal.4th 892, 903 [expert testimony on intimate partner violence relevant to victim's credibility].) Expert testimony on intimate partner violence, however, is not admissible to prove that abuse occurred; such evidence is admissible solely to assist the factfinder in determining whether certain conduct is relevant to the witness's credibility. (Evid. Code, § 1107, subd. (a); *People v. Brackins* (2019) 37 Cal.App.5th 56, 71.) Excluding speculative evidence on "black magic" offered to prove culpability of a third party while admitting evidence recognized to bear on credibility of trial witnesses does not demonstrate bias on the part of the trial court.

Accordingly, we find no abuse of discretion in the trial court's exclusion of Perlmutter's testimony.

## 2. *Exclusion of S.D.'s Prior Statement that He Deserved Beatings*

### a. *Background*

Attached to Moustafa's motion for a new trial was a copy of the police report prepared by Officer Walsh in San Luis Obispo. According to the Walsh's report, S.D. said that "he deserved these beatings [from Moustafa] because they were to make him better."

During trial, on direct examination as a witness for the defense, trial counsel posed the following question to Walsh: "Do you remember if [S.D.] ever told you that he deserved the beatings because they would make him better?" The prosecutor objected to this question on the ground that it was leading, which the trial court sustained. Trial counsel then asked, "Did [S.D.] ever tell you that he deserved what happened?" Again, the prosecutor objected to the question on the ground that it was leading, which the trial court sustained.

Trial counsel then asked, "Did [S.D.] ever tell you in his mind [the beatings] were justified?" The prosecutor objected on the ground that the question was leading, which the trial court sustained. Trial counsel then asked, "Did [S.D.] tell you anything about how he felt about the beatings?" The prosecutor objected to this question on the ground that it was leading, which the trial court overruled. Walsh subsequently answered, "That they caused him pain."

### b. *Analysis*

Moustafa argues that the trial court erroneously excluded evidence that S.D. had previously told Walsh that he believed that he deserved the beatings "because they were to make him better." Yet as the Attorney General points out, the trial court did not exclude Walsh's testimony based on its substance. The trial court sustained the prosecutor's objections to trial counsel's questions based on form—below, the prosecutor argued that the questions posed to Walsh were leading.

78

On direct examination, it is generally prohibited to ask a leading question, which is defined as "a question that suggests to the witness the answer that the examining party desires." (Evid. Code, §§ 764, 767.) Here, in attempting to elicit from Walsh a description of S.D.'s prior statement, trial counsel improperly used leading questions by suggesting to Walsh that S.D. had said that he deserved the beatings. We discern no abuse of discretion in the trial court's decision to exclude the questions as leading. (See *People v. Williams* (2008) 43 Cal.4th 584 [Evidence Code section 767 vests trial court with broad discretion to decide when to permit use of leading questions on direct examination]; but see *People v. Collins* (2010) 49 Cal.4th 175, 215 [leading questions permitted " 'to the extent necessary to stimulate or revive [the witness's] recollection' "].)

Moreover, even if we assume that the trial court erred in barring trial counsel from asking leading questions, it does not follow that we must necessarily reverse the judgment. Had Walsh testified that S.D. had previously said he deserved the beatings and that the abuse was inflicted to somehow make him better, it is not reasonably probable that Moustafa would have received a more favorable verdict. (*Watson*, *supra*, 46 Cal.2d at p. 836.) At trial, S.D. never described the beatings as something he desired. Walsh's lone account that S.D. had once said that he thought he deserved the abuse was minimally probative as to S.D.'s veracity. The evidence would have also been largely cumulative as there was already evidence in the record from which Moustafa could have argued and the trial court could have inferred that S.D. thought he deserved to be assaulted—S.D. had written Moustafa a letter of apology after he was asked to leave the apartment in December 2012, S.D. continued to stay with Moustafa even after he was repeatedly attacked, and S.D. even testified that he had been led to believe that Moustafa would make him a "better person." Moreover, even if S.D. believed, after the fact, that he deserved his punishment, this post-hoc rationalization does not retroactively constitute

consent to the assault, nor does it otherwise support a defense to Moustafa's actions. Thus, Moustafa fails to demonstrate prejudicial error.[25]

Finally, we note that to the extent that Moustafa claims that either the trial court's exclusion of Perlmutter's testimony or its ruling on the leading questions posed to Walsh infringed upon his right to present a defense, "the application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense." (*People v. Thomas* (2021) 63 Cal.App.5th 612, 627.)  Accordingly, the trial court's application of Evidence Code sections 352 and 767 did not deprive Moustafa of his constitutional rights.

### E.    *Cumulative Error*

Moustafa argues that the cumulative effect of all the errors require reversal of the judgment.  "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.)  Here we have found only one error in trial counsel's failure to adequately investigate and present a mental health defense.  To the extent we have assumed others—counsel's failure to present *Stoll* evidence and to make a *Trombetta/Youngblood* motion, and the trial court's decision to prohibit trial counsel from asking Walsh leading questions about S.D.'s prior statement—we conclude that even if we consider these actual and assumed errors together, reversal is not required.

In part, we observe that although the physical evidence in this case was not particularly overwhelming, there was ample evidence that Moustafa committed the

---

[25] For these same reasons, we reject Moustafa's claim that trial counsel was ineffective for failing to elicit Walsh's testimony through the use of non-leading questions, which was first raised in his reply brief.  Even if this claim was preserved, Moustafa would be unable to demonstrate prejudice.  (See *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 [Court of Appeal does not consider argument first raised in reply brief absent showing why the argument could not have been raised earlier]; *Strickland*, *supra*, 466 U.S. at p. 694.)

charged crimes and was sufficiently conscious of his wrongdoing to attempt to minimize his acts in his account to law enforcement. S.D. and A.D. both testified at trial, and they largely corroborated each other's accounts of what transpired, while also acknowledging their prior misrepresentations. S.D.'s coworker, Zaragoza, also testified and corroborated S.D.'s testimony. Moustafa's friend, Chang, testified that she questioned Moustafa about why S.D. "acted the way that he did when he was at home"—for example, S.D. was not permitted to freely walk around the apartment—and Moustafa said that S.D. had once assaulted A.D. Chang also described observing Moustafa engage in controlling behavior over both S.D. and A.D. S.D.'s wounds were photographed at the hospital in San Luis Obispo, and Soble, a medical expert witness, testified that he did not believe that S.D.'s injuries could have been inflicted by masturbation alone.

"The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) Even assuming there were some errors at trial, Moustafa "was entitled to a fair trial but not a perfect one," and he received a fair trial below. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

## F.  *Senate Bill No. 567*

Moustafa argues in a supplemental brief that he is entitled to remand for resentencing due to recent amendments made to section 1170 that were effectuated by Senate Bill No. 567. He argues that he is entitled to resentencing under the new amendments made to section 1170, subdivision (b)(1) and (b)(2) as well as the amendment made to subdivision (b)(6). Because we conclude that remand for resentencing is required under section 1170, subdivision (b)(6), we need not reach Moustafa's arguments regarding subdivision (b)(1) and (b)(2).[26]

---

[26] As amended by Senate Bill No. 567, section 1170, subdivision (b)(1) and (2) now make the middle term the presumptive term unless "there are circumstances in

Moustafa was sentenced in part to a determinate term of 14 years and four months, which was composed in part of an upper term of twelve years on count 4 for human trafficking. At sentencing, the trial court noted that it "appreciate[d] counsel's recitation of mitigators in this particular case," but "[e]ven without the strict accounting the Court agrees with the probation report that there was a large amount of money taken during the course of this particular count. And Mr. Moustafa took advantage of a position of trust."

Effective January 1, 2022, section 1170, subdivision (b)(6) now provides that: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." The Attorney General concedes, and we agree, that the new version of section 1170, subdivision (b)(6) is retroactive and applies to Moustafa's case. (See *In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

The parties, however, disagree as to whether remand is required. Based on our review of the record, we believe that it is. As part of his motion for a new trial, Moustafa attached Coles's psychological report. According to Coles, Moustafa told him that he had been beaten "severely" by his father when he was in the third and fourth grades, and it appears that the physical abuse stopped after Moustafa's teachers saw his bruises and reported the injuries to the authorities. Moustafa also told Coles that he had been molested by a relative when he was around 12 years old.

---

aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (b)(2).)

We acknowledge that Coles did not opine that Moustafa's mental disorder was caused by or related in any way to the physical abuse inflicted by his father, or by the sexual abuse perpetrated by Moustafa's relative. The trial court, however, did not have the benefit of section 1170, subdivision (b)(6) at the time of the sentencing hearing, which establishes a presumption of a lower term if its provisions apply. (See *People v. Flores*, *supra*, 73 Cal.App.5th at p. 1039.) And at that time, Moustafa had less incentive to develop the record about whether his childhood trauma contributed to his current offenses.

Generally, when a sentencing court is unaware of the scope of its sentencing discretion, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Here, we can only speculate as to what the trial court would have decided had the record been more adequately developed and had section 1170, subdivision (b)(6) been in effect. Accordingly, we conclude that remand for resentencing is required. On remand, the trial court may revisit all its sentencing choices and must apply current law, including the versions of subdivision (b)(1) and (b)(2) of section 1170 that are now in effect. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

### III.    DISPOSITION

The judgment is reversed, and the matter is remanded for the sole purpose of resentencing under the new version of Penal Code section 1170 as amended by Senate Bill No. 567.

_____

LIE, J.

WE CONCUR:

_____

GROVER, ACTING P.J.

_____

WILSON, J.

*People v. Moustafa*
H047359